Alfred D. HUGHES and El Paso Holding
Corporation, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 90–878C.

United States Court of Federal Claims.

Oct. 23, 2003.

John K. Villa, Washington, D.C., attorney of record for the plaintiffs. David S. Blatt and Paul C. Rauser, Of Counsel, Washington, D.C.

Mark S. Sacks, Department of Justice, Washington, D.C., with whom were David W. Ogden, Acting Assistant Attorney General,

David M. Cohen, Director, Mark A. Melnick, Assistant Director, for the defendant.

## OPINION

MEROW, Senior Judge.

This case is one of the numerous *Winstar*-related cases arising out of the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183 (1989). The history of the savings and loan crisis of the early 1980's which spawned this litigation is discussed in detail in *United States v. Winstar Corp.*, 518 U.S. 839, 843–861, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (*Winstar III*); *see also Winstar Corp. v. United States*, 64 F.3d 1531, 1536 (Fed.Cir.1995) (*Winstar II*).

Plaintiffs, El Paso Holding Corporation ("El Paso") and Alfred D. Hughes ("Hughes") (collectively, "plaintiffs"), allege that defendant breached a contractual obligation to forbear from enforcing certain regulatory capital maintenance requirements arising from plaintiffs' "unassisted" acquisition of El Paso Federal Savings and Loan Association ("El Paso Federal").[1] The acquisition was "unassisted" because, in connection with its approval, the government did not enter into an assistance agreement or supervisory action agreement whereby the government provided cash assistance. Defendant counters that the approvals and forbearances granted for the acquisition of El Paso Federal were merely an exercise of its regulatory authority in this regard, and were not contractual in nature.

In the alternative, defendant raises other affirmative defenses. First, it argues that the government entities involved lacked authority to guarantee El Paso against the regulatory change which plaintiffs claim constituted a breach of contract. Second, the government contends that the Regulatory Capital Maintenance/Dividend Agreement ("RCMDA") signed by El Paso and the Federal Savings and Loan Insurance Corporation ("FSLIC") allocated the risk of the rel-

---

1. By Order, filed April 5, 2000, the Federal Deposit Insurance Corporation's ("FDIC") motion to intervene was granted. By Order, filed April 28, 2003, FDIC's motion to dismiss, pursuant to RCFC 41(a)(2) was granted and its complaint was dismissed with prejudice. FDIC's motions for summary judgment were denied as moot.

evant regulatory change to the plaintiffs. Finally, defendant asserts that neither plaintiff has standing to assert a claim for breach of contract. The matter is before the court on plaintiffs' motion for summary judgment and defendant's cross-motion for summary judgment.[2] For the reasons asserted below, plaintiffs' motion for summary judgment on liability for breach of contract is GRANTED–IN–PART and DENIED–IN–PART. Defendant's cross-motion for summary judgment is DENIED–IN–PART.

## BACKGROUND

### I.  El Paso Acquisition

El Paso Federal was originally chartered as a mutual savings and loan association in 1929 and received insurance accounts in 1934. As detailed in *Winstar III*, 518 U.S. at 845, 116 S.Ct. 2432, high interest rates and inflation in the 1980's caused many thrifts to fail because the cost of short-term deposits exceeded the revenues from long-term mortgages.  According to the Federal Home Loan Bank of Dallas ("FHLB–Dallas"), the Supervisory Agent's digest dated January 20, 1988, El Paso Federal's deteriorating financial condition was largely attributable to these factors.  Pls.' Ex. 7.[3] During the increase in deregulated interest rates on deposits in 1981 and 1982, El Paso Federal experienced significant operating losses due to the fact that the cost of funds was increasing faster than its interest income.  El Paso Federal responded by increasing the amount of loans originating on non-owner occupied properties in 1983, 1984, and 1985.  However, El Paso Federal continued to experience large operating losses because of the high level of non-performing loans.

According to a May 1988 internal Federal Home Loan Bank Board ("FHLBB") memorandum by the Office of General Counsel ("OGC"), El Paso Federal reported assets of approximately $247.8 million, total liabilities of $258.8 million, negative regulatory capital of approximately $4 million, and negative net worth on a Generally Accepted Accounting Principles ("GAAP") basis of over $9 million as of November 30, 1987.  Pls.' Ex. 9.  According to the May 12, 1988 executive summary prepared by the FHLBB's Director of Corporate Activities, Office of Regulatory Policy, Oversight and Supervision ("OR-POS"), El Paso Federal reported total assets of $248.4 million, total liabilities of $259.9 million, and negative regulatory capital of $11.5 million as of March 31, 1988.  Pls.' Ex. 8. In a May 1988 internal FHLBB memorandum by OGC, it was noted that the Supervisory Agent and ORPOS "have determined that El Paso Federal currently is insolvent when its capital is calculated under generally accepted accounting principles ('GAAP') on a going concern basis."  Pls.' Ex. 9.

On August 13, 1987, Hughes, El Paso, and El Paso Federal entered into an Agreement and Plan of Merger and Supervisory Conversion ("Merger Plan").  Pls.' Ex. 3.  Pursuant to the Merger Plan, Hughes and El Paso proposed to acquire El Paso Federal through an El Paso subsidiary, El Paso Savings Association ("New El Paso").  Under the plan, El Paso Federal would convert from a mutual savings and loan association to a state-chartered stock association and merge with and into New El Paso. The resulting institution, New El Paso, would become a wholly-owned subsidiary of El Paso. The Merger Plan included several conditions precedent to the obligations of Hughes and El Paso, including:

> 8.04.  Accounting Method.  The receipt by Purchasers of an opinion of the Purchaser's independent certified public accountants that the transaction may be accounted for under Generally Accepted Accounting Principles ("GAAP") using purchase or "push-down" accounting, and the approval of this accounting in accordance with GAAP. For Regulatory Accounting Purposes ("RAP"), approval by the FHLBB to

---

**2.**  Defendant has also moved for summary judgment on plaintiffs' takings claim and claims for rescission and pre-judgment interest.  Because plaintiffs' motion for summary judgment for breach of contract is granted and the remaining issues in this regard relate to resolving breach damages, the court does not address these issues.

To the extent they may still be relevant, they will be addressed in the further proceedings.

**3.**  Unless otherwise noted, all citations to plaintiffs' exhibits references the Appendices and Exs. to Pls.' Br. in Supp. of Mot. for Summ. J.

allow the accretion of discounts over the estimated or actual portfolio life and the amortization of goodwill using the straight-line method over a twenty-five-year life, or such other life and amortization period as is acceptable to [ORPOS] and Supervision of the Federal Home Loan Bank System

. . .

8.07 Regulatory Waivers. The regulatory forbearances and waivers listed on Schedule 6.01 shall have been granted by the FHLBB or waived by the Purchasers. Pls.' Ex. 3.[4] According to Schedule 6.01, among the forbearances requested was the amortization of goodwill arising from purchase method accounting, for regulatory purposes, by use of the straight-line method over a 25 year period.

On August 17, 1987, El Paso filed an H-(e)1 application with the FHLBB for approval of a supervisory conversion and merger. The application was signed by El Paso's president, Hughes. According to the Merger Plan, El Paso would own 100 percent of the outstanding common stock of New El Paso in exchange for contributing property valued at $35 million (after debt) and $11.5 million in cash. New El Paso proposed issuing one million shares of common stock to El Paso in exchange for fourteen parcels of real estate controlled by Hughes with a net estimated appraisal value (after debt) of $35 million. According to a May 1988 OGC memorandum, the real estate was initially contributed by Hughes to El Paso and then transferred to New El Paso. Pls.' Ex. 9. It consisted of the Waterford Centre valued at $8.1 million, Steiner ranch valued at $13.4 million, and twelve "section 8" apartments valued at $13.5 million. According to the Supervisory Agent's digest, the "appraisal department of the Federal Home Loan Bank of Dallas inspected all of the properties to be contributed and endorses the values presented above." Pls.' Ex. 7. As detailed below, defendant now disputes the true value of the properties

contributed by Hughes. In order to provide assurance as to the creditworthiness of the "section 8" apartments, Hughes executed a personal guarantee that the cash flow from these properties would not be less than $1 million per fiscal year for ten years. After conveyance of the Steiner Ranch New El Paso paid off the outstanding debt on this property to all third party lenders.[5]

In his individual capacity, Hughes would purchase $1.5 million of Series B subordinated notes issued by New El Paso. New El Paso would also issue $10 million of Series A subordinated notes to retire a portion of the related debt on the Steiner properties. According to the May 1988 internal OGC memoranda, "T.C. Steiner and Son, a Texas General Partnership and Steiner and Sons, Ltd. (the 'Steiner Partnerships') will purchase 100,000 shares of the Series A subordinated debt for an aggregate purchase price of $10,000,000 in cash." Pls.' Ex. 9.[6] The purchase of the $10 million of Series A notes was structured differently than the cash purchase of the Series B notes. Plaintiffs have explained that instead of receiving $10 million cash, New El Paso "simply paid out $10 million less than it otherwise would have paid to retire the debt on the contributed properties." Pls.' Supplemental Br. at 6. The total amount owed to Mr. Steiner was $21.5 million. However, New El Paso only paid out $11.5 million. On May 27, 1988, Hughes executed a promissory note payable to Mr. Steiner for the remaining $10 million. App. in Supp. of Pls.' Supplemental Br. at A312 ("Pls.' App."). In addition, New El Paso would make a loan of $34.4 million to a newly formed subsidiary to develop the Steiner Ranch property.

According to an internal FHLBB memorandum prepared by OGC, New El Paso would emerge from the plan with total assets of $328.8 million, total liabilities of $293.3 million, and regulatory capital and GAAP net

---

4. The purchase method of accounting allows for the recognition of supervisory goodwill for accounting purposes. Supervisory goodwill is calculated as the equivalent of the excess of the fair market value of the liabilities assumed over the fair market value of the assets acquired.

5. The Steiner Ranch had a appraised value of $44.5 million with $34.5 million of outstanding debt.

6. T.C. Steiner and Son and Steiner and Son, Ltd. are controlled by Mr. Tommy C. Steiner, who had been a business partner of Hughes.

worth of $46.5 million. Pls.' Ex. 9. On May 13, 1988, the FHLBB, in a letter signed by ORPOS, the Office of the District Bank ("ODB"), and OGC, approved the El Paso application to acquire El Paso Federal and merge it into New El Paso. Pursuant to their delegated authority, the signatories found that the transactions "are instituted for supervisory reasons and are necessary to prevent the probable failure of the Old Institution." Pls.' Ex. 4. The approval letter provided that "[p]ursuant to delegated authority to approve the applications noted herein, the Secretary or an Assistant Secretary of the Board is hereby directed and authorized to issue to the New Institution a letter, effective upon the merger of the Old Institution into the New Institution concerning supervisory forbearances." Pls.' Ex. 4. In addition, the approval letter stated the Secretary of the Board was authorized to issue a certificate of insurance provided that New El Paso "obtain approval of the Federal Home Loan Bank of Dallas pursuant to 12 C.F.R. § 563.8–1 of an application requesting approval to include in the New Institution's Regulatory Capital the proposed $11.5 million worth of subordinated debentures . . . ." Pls.' Ex. 4.

On the same day, the FHLBB issued a forbearance letter signed by the Board's acting secretary granting six forbearances in association with the supervisory conversion and merger, including:

1) . . . the Federal Savings and Loan Insurance Corporation ("FSLIC") will forbear, for a period not to exceed five (5) years following consummation of the acquisition ("Effective Date"), from exercising its authority under Section 561.13 of the Insurance Regulations, for any failure of El Paso to meet the net worth requirements of Section 561.13 arising solely from an increase in the contingency factor attributable to El Paso at the date of acquisition.

2) For a period not to exceed five (5) years, from the Effective Date, the FSLIC will forbear from exercising its authority under Section 563.9–8(c)(2)(i) or (ii) or (iii) (Threshold for Equity Risk Investments) of the Insurance Regulations, to allow New El Paso to exclude all investments currently in El Paso's portfolio in determining the amount available for equity risk investments.

3) For purposes of reporting to the Board, the value of any unidentifiable intangible assets resulting from accounting for the merger in accordance with the purchase method may be amortized by New El Paso over a period not to exceed twenty five (25) years by the straight line method, from the Effective Date.

4) Not later than one hundred twenty (120) days following the Effective Date, New El Paso shall submit to the Supervisory Agent an independent certified public accountant's opinion that New El Paso has accounted for this merger in accordance with generally accepted accounting principles except as herein provided by the Board, for purposes of reporting to the Board, the value any unidentifiable intangible assets resulting from the merger may be amortized by New El Paso over a period not to exceed twenty five (25) years by the straight line method.

Pls.' Ex. 5. On May 27, 1988, El Paso and FSLIC entered into the RCMDA providing:

WHEREAS, the Acquiror has filed the appropriate applications ("Applications") with the FSLIC for approval of its acquisition of El Paso Federal Savings and Loan Association, El Paso, Texas ("El Paso Federal"), by merging El Paso Federal with and into the Acquiror's wholly-owned subsidiary, New El Paso Savings and Loan Association (the "Resulting Institution");

WHEREAS, in reviewing the Applications, the FSLIC must make a determination that the financial and managerial resources and future prospects of the Acquiror, El Paso Federal and the Resulting Institution are not detrimental to the Resulting Institution or the insurance risk of the FSLIC;

. . .

WHEREAS, the Acquiror is willing to make such a commitment in order that the FSLIC will approve the acquisition.

NOW, THEREFORE, in consideration of the FSLIC approving the acquisition of control of El Paso Federal by the Acquiror, the Acquiror agrees as follows: . . . .

App. to Def.'s Cross–Mot. for Summ. J at 207 ("Def.'s App."). Under section II, El Paso agreed that:

A. As long as the Acquiror shall maintain the Resulting Institution, the Acquiror will cause the Regulatory Capital of the Resulting Institution to be maintained at a level at or above the Regulatory Capital Requirement and as necessary, will infuse sufficient additional capital, in a form satisfactory to the Supervisory Agent, to effect compliance with such requirement and cure a Regulatory Capital Deficiency during the first quarter after which the Resulting Institution fails to meet its Regulatory Capital Requirement.

B. Unless written approval has been obtained from the Supervisory Agent, the Resulting Institution shall not pay, and the Acquiror shall not accept from the Resulting Institution, dividends that exceed 50 percent of the Resulting Institution's net income for the fiscal year ... but in no event may dividends be paid or stock be repurchased by the Resulting Institution that would reduce the Regulatory Capital of the Resulting Institution below the Resulting Institution's Regulatory Capital Requirement.

Def.'s App. at 206. Section VI of the RCMDA also states:

B. This Agreement shall be deemed a contract made under and governed by Federal law.

C. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

...

E. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both of the parties.

Def.'s App. at 210. On September 9, 1988, FHLB–Dallas found that the compliance material submitted by plaintiffs was complete and met the requirements contained in the FHLBB's approval letter. Pls.' Ex. 17.

## II. FIRREA

Under FIRREA, the FHLBB was replaced by the Office of Thrift Supervision ("OTS") and the OTS Director was responsible for the regulation of all federally insured savings associations and the chartering of all federal thrifts. *Winstar II,* 64 F.3d at 1538. The OTS director was required to "prescribe and maintain uniformly applicable capital standards for savings associations." 12 U.S.C. § 1464(t)(1)(A). As a result of FIRREA, New El Paso was unable to meet the minimum tangible, core, and risk-based capital requirements. On July 11, 1990, OTS informed New El Paso that its March 31, 1990 calculation of regulatory capital "incorrectly includes a portion of goodwill as a capital component," and that it had been out of compliance with FIRREA's capital standards on and after February 28, 1990. Pls.' Ex. 20. On August 2, 1990, OTS directed New El Paso "to *immediately* discontinue including supervisory goodwill in the amount of approximately $41.5 million, or in any other amount, in its core capital calculation ...." Pls.' Ex. 21. On July 2, 1990, the Commissioner of the Texas Savings and Loan Department placed New El Paso in a conservatorship for failing to satisfy federal regulatory capital requirements. On September 7, 1990, OTS placed New El Paso in a receivership for the same reason. Pls.' Ex. 23.

## Discussion

### I. Jurisdiction

A waiver of traditional sovereign immunity "cannot be implied but must be unequivocally expressed." *Saraco v. United States,* 61 F.3d 863, 864 (Fed.Cir.1995) (quoting *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)). In this case, the court has jurisdiction over plaintiffs' claims based on an express or implied contract with the United States pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1). *See United States v. Connolly,* 716 F.2d 882, 885 (Fed.Cir.1983) (en banc).

### II. Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact and that the moving

party is entitled to judgment as a matter of law." RCFC 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A material fact is one that would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment will not be granted "if the dispute is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The court must resolve all reasonable inferences in favor of the non-moving party. *Id.* at 255, 106 S.Ct. 2505. The burden on the moving party for summary judgment, to demonstrate that there is no genuine issue of material fact, may be discharged if it can show "that there is an absence of evidence to support the non-moving party's case." *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed.Cir.1987) (quoting *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548). The burden then shifts to the non-moving party to produce evidence setting forth specific facts that there is a genuine issue for trial. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. "Mere denials, conclusory statements or evidence that is merely colorable or not significantly probative is not sufficient to preclude summary judgment." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 627 (Fed.Cir. 1984) (citing *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 836 (Fed.Cir.1984)) (holding that non-movant "must set out, usually in an affidavit from one with personal knowledge of specific facts, what specific evidence could be offered at trial."). Instead, to create "a genuine issue of fact, the nonmovant must do more than present *some* evidence on an issue it asserts is disputed." *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1560 (Fed.Cir.1988).

### III. Contract Formation

#### A. Contract Principles

The Supreme Court in *Winstar III* directed courts deciding *Winstar*-related cases to apply "ordinary principles of contract construction and breach that would be applicable to any contract between private parties."

518 U.S. at 871, 116 S.Ct. 2432. Whether a contract exists is a mixed question of law and fact. *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed.Cir.1998). "The requisite elements of contract with the government are no different in *Winstar* cases than in other cases in which a contract with the government is alleged: mutual intent; including an unambiguous offer and acceptance; consideration; and authority on the part of the government representative to bind the government." *First Commerce Corp. v. United States*, 335 F.3d 1373, 1379–80 (Fed.Cir.2003). These general requirements apply equally to an express and an implied contract. *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed.Cir. 1997). In *Winstar III*, the Supreme Court concluded that a contract existed between the government and financial institutions based in-part on assistance agreements and supervisory action agreements with integration clauses. 518 U.S. at 864–66, 116 S.Ct. 2432.

In *California Fed. Bank, F.S.B. v. United States*, 245 F.3d 1342 (Fed.Cir.2001) (*CalFed II*), *cert. denied*, 534 U.S. 1113, 122 S.Ct. 920, 151 L.Ed.2d 884 (2002), the Federal Circuit held that the parties entered into a contract allowing the amortization of supervisory goodwill even in the absence of any assistance agreement or supervisory action agreement with an integration clause. The Federal Circuit concluded that:

> [I]f the factual records of individual cases show intent to contract with the government for specified treatment of goodwill, and documents such as correspondence, memoranda, and [FHLBB] resolutions confirm that intent, the absence of an [assistance agreement] or [supervisory action agreement] should be irrelevant to the finding that a contract existed.

*CalFed II*, 245 F.3d at 1347.

However, there "needs to be something more than a cloud of evidence that could be consistent with a contract to prove a contract and enforceable contract rights." *D & N Bank v. United States*, 331 F.3d 1374, 1377 (Fed.Cir.2003). Instead, plaintiff must be able to "identify with particularity an offer

memorializing the terms that it allegedly proposed to the government ...." *First Commerce,* 335 F.3d at 1380.

### B. Contemporaneous Documents and Surrounding Circumstances

Plaintiffs contend that the FHLBB's approval of their acquisition and supervisory conversion of El Paso Federal into New El Paso, along with the Merger Plan, correspondence, memoranda, forbearance letter and RCMDA, formed the contract at issue. The government argues that the evidence regarding the supervisory conversion and merger of El Paso Federal into New El Paso reflects nothing more than the FHLBB's routine exercise of its regulatory authority to approve such transactions. However, the Federal Circuit has recently affirmed that "the argument that the government is immune from contractual liability because it was acting in its regulatory capacity was rejected squarely by this court and the Supreme Court in Winstar." *First Commerce,* 335 F.3d at 1383. The Federal Circuit went on to state:

> The issue in this case, as in other Winstar cases, is whether the government, in exchange for First Commerce's agreement to rescue a failing thrift, also made promises that certain regulatory treatment would be extended and maintained: namely, treating supervisory goodwill as regulatory capital and permitting its amortization over an extended period of time.

*Id.*

Plaintiffs' claim that they agreed to save El Paso Federal is supported by the FHLBB's approval letter stating that the "transactions are instituted for supervisory reasons and are necessary to prevent the probable failure of the Old Institution." Pls.' Ex. 4. In Article 6.01 of the Merger Plan, it stated that the transaction was conditioned on the approval of the requested forbearances "in form and substance reasonably satisfactory" to all the parties. Pls.' Ex. 3. Among the forbearances requested was the "amortization of goodwill arising from purchase accounting for regulatory purposes, by use of the straight-line method over a 25 year period." Pls.' Ex. 3. Plaintiffs' application for acquisition and merger of El Paso

Federal clearly stated that "an integral part of this Application is the assumption that FHLBB will act quickly on this Application and will grant certain regulatory forbearances to the Applicant as a result of its acquisition of El Paso Savings. A complete schedule of requested forbearances appears in the Business Plan attached to part II of the Application." Def.'s App. at 64. The Merger Plan attached to the application requested several forbearances, including "amortization of goodwill arising from purchase accounting, for regulatory purposes, by use of the straight-line method over a 25 year period." Def.'s App. at 151. In *Admiral Fin. Corp. v. United States,* 54 Fed.Cl. 247, 256 (2002), the court held that an identical provision in the merger plan was "not merely an exercise of the FHLBB's regulatory powers—the merger was conditioned on terms 'reasonably satisfactory to Admiral.' This is the language of a party to a contract, not an entity routinely submitting to a regulatory entity."

In its most recent *Winstar* decision, *Anderson v. United States,* 344 F.3d 1343 (Fed.Cir.2003), the Federal Circuit confirmed that a similar request for amortization of goodwill constituted an offer. In its initial application, Westport, the acquiring institution in *Anderson* requested certain supervisory forbearances and waivers in exchange for infusing capital into a failing thrift. In a subsequent amendment, the acquiring institution specified that the purchase method of accounting would be used to amortize goodwill on a straight-line basis over a specified period of years. The Circuit agreed "with the Court of Federal Claims that Westport and David L. Paul asked for permission to amortize goodwill on a straight-line basis as a condition of acquiring Dade S & L." *Id.* at 1353–54. In *CalFed II,* 245 F.3d at 1345, the Federal Circuit concluded that a similar request in the Family transaction for a "commitment regarding amortization of goodwill was contained in the Acquisition Agreement, Article 6.1(a), which stated that the resulting institution of Cal Fed and Family may amortize any goodwill created under the purchase method of accounting using the straight line method over the useful life of 40 years."

Similar to the El Paso Merger Plan, the "amortization was structured in the agreement as a condition precedent to Cal Fed's obligations." *Id.* The *Anderson* court reaffirmed its holding in *CalFed II*, concluding "the acquiring institution made a specific written offer by requesting, as a condition of its acquisition of failing thrifts, permission to adopt 'purchase method of accounting using the straight line method ....'" 344 F.3d at 1357–58.

The Federal Circuit has "previously held that forbearance letters may demonstrate a contractual obligation by the government 'to recognize the supervisory goodwill and the amortization periods reflected in the forbearance letters.'" *First Commerce*, 335 F.3d at 1381 (quoting *CalFed II*, 245 F.3d at 1347). The FHLBB approval letter issued to plaintiffs provided that "the Secretary or an Assistant Secretary of the Board is hereby directed and authorized to issue to the New Institution a letter, effective upon the merger of the Old Institution into the New Institution concerning supervisory forbearances." Pls.' Ex. 4. The government responds that neither the acquisition approval letter nor the forbearance letter contain any promise to allow New El Paso to record supervisory goodwill as an asset to be included in its regulatory capital. However, that is precisely what the forbearance letter promised when it stated that "for purposes of reporting to the Board, the value of any unidentifiable intangible assets resulting from accounting for the merger in accordance with the purchase method may be amortized by New El Paso over a period not to exceed twenty five (25) years by the straight line method ...." Pls.' Ex. 5. The forbearance letter also required New El Paso to submit an accountant's letter that it had accounted for the merger in accordance with GAAP "except as herein provided by the Board, for purposes of reporting to the Board, the value any unidentifiable intangible assets resulting from the merger may be amortized by New El Paso over a period not to exceed twenty five (25) years by the straight line method." Pls.' Ex. 5.

The Federal Circuit interpreted an identical provision in the forbearance letter in the *Winstar* case "as an express agreement allowing Winstar to proceed with the merger plan approved by the Bank Board, including the recording of supervisory goodwill as a capital asset for regulatory capital purposes to be amortized ...." 64 F.3d at 1544; *Anderson*, 344 F.3d at 1356–57 ("The Bank Board made a manifest contractual promise to Winstar in its forbearance letter, agreeing to permit extended amortization of goodwill ...."). The FHLBB went beyond mere regulatory language when it agreed:

> For purposes of reporting to the Board, the value of any intangible assets resulting from accounting for the merger in accordance with the purchase method may be amortized by [Winstar] over a period not to exceed 35 years by the straight-line method ....

64 F.3d at 1544.

In *CalFed II*, the Federal Circuit found that "the FHLBB and the FSLIC were contractually bound to recognize the supervisory goodwill and the amortization periods reflected in the forbearance letters." 245 F.3d at 1347; *Sterling Savings v. U.S.*, 53 Fed.Cl. 599, 609–610 (2002). In *First Commerce*, the Circuit found that an identical forbearance letter, issued pursuant to an approval letter signed by ORPOS and OGC, "express the government's promise to offer favorable accounting treatment, ...." 335 F.3d at 1373. As the Federal Circuit has explained, "if the Bank Board had wanted to permit such depreciation of goodwill, it knew how to do so, as it did in contracting with Winstar." *Anderson*, 344 F.3d at 1357–58. In this case, the government did exactly that when it when it issued the approval and forbearance letters clearly manifesting its intent to accept plaintiffs' offer and be bound by the terms of the resulting contract.

The FHLBB approval letter, forbearance letter and various internal memoranda reviewing the application confirm that the government entered into a contract allowing New El Paso to count supervisory goodwill toward regulatory capital and amortize it over a 25 year period. On January 20, 1988, the Principal Supervisory Agent ("PSA") informed ORPOS that the requested forbearances included "amortization of goodwill aris-

ing from purchase accounting, for regulatory purposes, by use of the straight-line method over a 25 year period." Pls.' Ex. 7. The PSA confirmed that it had no supervisory objection to the requested forbearance. The OR-POS executive summary states "EPHC has requested the following forbearances in connection with this transaction; ... (6) Amortization of goodwill arising from the purchase accounting, for regulatory purposes, by use of straight line method over a twenty five (25) year period; ...." Pls.' Ex. 8. It recommended that FHLB–Dallas "takes no supervisory objection to the requested forbearances in items ... 6 ... with which we concur." Pls.' Ex. 8.

Defendant attempts to distinguish *CalFed II* by arguing that the El Paso acquisition more closely resembles cases where no contract has been found. Specifically, defendant argues that the facts of this case are controlled by *D & N Bank,* 331 F.3d at 1374; *Advance Bank, F.S.B. v. United States,* 52 Fed.Cl. 286 (2002); *Fifth Third Bank of W. Ohio v. United States,* 52 Fed.Cl. 264 (2002); and *Anchor Sav. Bank, F.S.B. v. United States,* 52 Fed.Cl. 406 (2002). However, the El Paso transaction is distinguishable from each of these cases. Defendant's reliance on *D & N Bank* is misplaced because the "presence of the forbearance letter distinguishes this case from D & N Bank, in which there were no written documents articulating the government's agreement to provide favorable accounting treatment." *First Commerce,* 335 F.3d at 1381. In *Advance,* the court found that the "conditional approval letter here contrasts starkly with the forbearance letters issued in *California Federal,* which, following a detailed description of purchase accounting and the periods for goodwill amortization and accretion of discount, expressly stated: ...." 52 Fed.Cl. at 289.

In *Anchor,* the court distinguished *CalFed II* because the transaction lacked either an assistance agreement or a forbearance letter. 52 Fed.Cl. at 420. In fact, the court remarked that "the critical facts for the Federal Circuit amount to the 'supervisory goodwill and the amortization periods reflected in the forbearance letters.'" *Id.* In *Fifth Third,* the court denied the plaintiff's motion

for summary judgment because the "instant record does not contain an explicit communication from FHLBB to plaintiff regarding the use of the purchase method to account for the transaction, the amortization of goodwill, or the inclusion of goodwill in computing regulatory capital requirements." 52 Fed.Cl. at 271. In contrast, the court held:

> The record for two of the three transactions in Winstar included such a communication. With regard to the Winstar transaction, a forbearance letter from FHLBB to the plaintiff "stated that intangible assets resulting from the use of purchase method of accounting 'may be amortized ... over a period not to exceed 35 years by the straight-line method.'" ... Likewise, in *CalFed* the record for the Brentwood Savings and Loan Association transaction revealed that FHLBB "issued a forbearance letter stipulation that the resulting association may amortize any goodwill created over 35 years." 245 F.3d at 1345. Similarly, FHLBB issued a forbearance letter confirming *CalFed's* entitlement to record the Family Savings and Loan transaction "under the purchase method of accounting and amortize resulting goodwill over 40 years." *Id.*

52 Fed.Cl. at 271 n. 12. Thus, each of the cases cited by defendant are distinguishable from *CalFed II* because those transactions lacked any documents such as a forbearance letter that manifested a mutual intent to enter into a goodwill contract. In the El Paso transaction, there are written documents specifically memorializing the government's acceptance of plaintiffs' offer regarding the accounting treatment of supervisory goodwill.

Defendant argues that the lack of mutual intent to contract is demonstrated by an absence of extensive negotiations regarding supervisory goodwill. In *Winstar II,* 64 F.3d at 1542, the court stated that if the parties did not intend to use supervisory goodwill for regulatory capital "there would simply be no reason for the extensive negotiations and conditions regarding its use." As discussed above, the Merger Plan, the acquisition application, the various correspondence and memoranda, the FHLBB approval letter, forbear-

ance letter, and RCMDA demonstrate that the parties did indeed intend to enter into such a contract. In *Admiral,* the court held:

> The Federal Circuit certainly was not establishing "negotiations" as a litmus test. It merely observed that extensive negotiations prompted by the Government was consistent with an intent by each party to be contractually bound regarding the regulatory forbearances. The history of negotiations may sometimes be looked at to determine contractual intent. But in the end it is only a guidepost.

54 Fed.Cl. at 255. It then concluded that the documents "all support the Plaintiff's position that the parties intended to and did enter into a contractual agreement . . . ." *Id.* at 256. Similarly, the contemporaneous documents in this case confirm that the government contractually agreed to plaintiffs' specific requests for purchase method accounting and the treatment of supervisory goodwill.

## IV. Breach

█ The contractual agreement authorizing the use of purchase method accounting and its amortization over a 25 year period was breached by FIRREA. As described earlier, FIRREA prevented New El Paso from using its supervisory goodwill in meeting its minimum regulatory capital requirements. As such, the OTS regulations were a breach of the government's promise that New El Paso could include supervisory goodwill in regulatory capital and amortize it over an extended period. *Winstar II,* 64 F.3d at 1544–45; *CalFed II,* 245 F.3d at 1348.

## V. Contracting Authority

### A. FHLBB's Authority

█ Defendant argues that the FHLBB lacked the statutory authority to guarantee a thrift holding company, such as El Paso, against the risk of regulatory change. The

government argues that the statute relied upon by the Supreme Court and the Federal Circuit, 12 U.S.C. § 1729(f)(2) (repealed),[7] only provides authority for the FHLBB to guarantee against loss to "insured institutions." Instead, it asserts that 12 U.S.C. § 1730a(m) and § 1729(f)(3) govern non-insured institutions, such as El Paso.

Plaintiffs counter that the FHLBB had authority under section 1729(f)(2) because El Paso Federal merged with New El Paso, an insured institution, through a supervisory conversion. As the May 13, 1988 FHLBB approval letter stated, "[New El Paso] is hereby granted FSLIC insurance of accounts and the Secretary or the Assistant Secretary of the Board is authorized to issue a certificate of insurance to [New El Paso] . . . ." Pls.' Ex. 4. In the same letter, the Bank Board approved "a voluntary supervisory conversion in which [El Paso Federal] will be merged with and into [New El Paso], an interim state stock savings and loan association, to be organized by El Paso Holding Corporation . . . ." Pls.' Ex. 4. Therefore, plaintiffs contend that this involved a merger of insured institutions under section 1729(f)(2). *See Hometown Fin., Inc. v. United States,* 53 Fed.Cl. 326, 335 (2002) (holding that a voluntary supervisory conversion by a holding company through a newly-acquired thrift was a merger under 12 U.S.C. § 1729(f)(2)). However, defendant argues that New El Paso was not an insured institution because the Secretary's certificate of insurance was conditioned on the fact that "[New El Paso] has consummated its merger with [El Paso Federal] and [New El Paso] has not opened for business prior to such merger . . . ." Pls.' Ex. 4. *See Home Sav. of Am. v. United States,* 50 Fed.Cl. 427, 441–42 (2001) (concluding that similar transaction was governed by section 1729(f)(3) acquisitions instead of a merger of two insured institutions).

---

7. 12 U.S.C. § 1729(f)(2) provides that FSLIC may prescribe:

(i) to purchase any such assets or assume any such liabilities;

(ii) to make loans or contributions to, or deposits in, or purchase the securities of, such other institution . . . ;

(iii) to guarantee such other institution . . . against loss by reason of such other institution's merging or consolidating with or assuming the liabilities and purchasing the assets of such insured institution; or

(iv) to take any combination of the actions referred to in clauses (i) through (iii).

Even if defendant is correct that section 1729(f)(2) does not apply, sections 1729(f)(3) and 1730a(m) provide ample statutory authority for FSLIC to enter into a contract with El Paso in this situation. Section 1729(f)(3) states:

> The Corporation may provide any person acquiring control of, merging with, consolidating with or acquiring the assets of an insured institution under section 1730a(m) of this title with such financial assistance as it could provide an insured institution under this subsection.

12 U.S.C. § 1729(f)(3)(1988). Section 1730a(m) provides that FSLIC "may authorize any company to acquire control of said insured institution or to acquire the assets or assume the liabilities thereof." 12 U.S.C. § 1730a(m)(1)(A)(i)(1988). Section 1730a(m) also states that FSLIC's authority under this statute "shall be on such terms as the Corporation shall provide." 12 U.S.C. § 1730a(m)(1)(A)(ii). As such, it provides general contracting authority for FSLIC to guarantee against the risk of loss. *Globe Savs. Bank, F.S.B. v. United States*, 55 Fed. Cl. 247, 259 (2003) ("This section literally gives the FSLIC *carte blanche* to set the terms of a contract in an emergency acquisition.") (emphasis in original).

According to the government, the court should "interpret section 1729(f)(3)'s limited authorization to include only the provision of direct, immediate payments to non-insured entities-not the ability to enter into a contractual relationship guaranteeing against loss." Def.'s Cross–Mot. for Summ. J. at 40. Although the term "financial assistance" is not defined in the statute, defendant argues that it includes assuming liabilities or making loans under subsections 1729(f)(2)(i)-(ii) but does not include guaranteeing against loss under subsection (iii). However, as the court said in *Globe Savs.*, 55 Fed.Cl. at 260, the "controlling precedent and the breadth of the term 'financial assistance' both provide adequate independent grounds for this Court's holding that the FHLBB and the FSLIC had full authority to contract with a holding company to bear the risk of regulatory change." *See also Hometown*, 53 Fed.Cl. at 335 n. 10 ("The court finds that the term 'financial

assistance' does not exclude guarantees against risk of loss, because such guarantees are certainly a form of 'financial assistance.'"); *Admiral*, 54 Fed.Cl. at 258 ("The Government provided financial assistance in the form of incentives respecting the regulatory treatment of goodwill.").

Furthermore, defendant's argument ignores controlling case law establishing FHLBB's broad authority to enter into contracts under 12 U.S.C. § 1725(c). The court "cannot ignore the Circuit's holding that the FSLIC's general contracting authority is sufficient to establish a binding commitment to bear the risk of regulatory change." *Hometown*, 53 Fed.Cl. at 334. The Federal Circuit clearly held:

> We have already answered the question of whether the FHLBB and the FSLIC have the authority to enter into contracts like these in the affirmative [in *Winstar Corp. v. United States*, 64 F.3d 1531, 1548]. Since its inception, the FSLIC has had the authority under 12 U.S.C. § 1725(c)(3) to make contracts. Further, both the FSLIC and its supervisory agency, the FHLBB, have had the "authority both to extend assistance to acquirers of insolvent FSLIC-insured thrifts, 12 U.S.C. § 1729(f)(2)(A) (repealed), and to set minimum capital limits on a case-by-case basis, 12 U.S.C. § 1730(t)(2) (repealed)."

*CalFed II*, 245 F.3d at 1347 (internal citations omitted).

In *Winstar III*, the Supreme Court confirmed:

> [T]here is no question ... that the Bank Board and FSLIC had ample statutory authority to ... promise to permit respondents to count supervisory goodwill and capital credits toward regulatory capital and to pay respondents' damages if that performance became impossible. The organic statute creating FSLIC as an arm of the Bank Board, 12 U.S.C. § 1725(c) (1988 ed.) (repealed 1989), generally empowered it "to make contracts," and § 1729(f)(2), enacted in 1978, delegated more specific powers in the context of supervisory mergers .... Congress specifically recognized FSLIC's authority to permit thrifts to count goodwill toward capital requirements

when it modified the National Housing Act in 1987 [citing 12 U.S.C. § 1730h(d) (1988 ed.) (repealed)] . . . .

518 U.S. at 890–91, 116 S.Ct. 2432.

In *Winstar III*, both Statesmen and Winstar were holding companies. As such, the Supreme Court "also must have relied upon the FSLIC's plenary power to enter into contracts, pursuant to subsection 1725(c)(3)." *Globe Savs.*, 55 Fed.Cl. at 258; *See also Franklin Fed. Sav. Bank v. United States*, 53 Fed.Cl. 690 (2002); *Admiral*, 54 Fed.Cl. at 247. Thus, defendant's argument that the FHLBB and FSLIC lacked statutory authority to guarantee a holding company against the risk of loss is unconvincing and contrary to controlling precedent.

**B.   OGC and ORPOS Authority**

■ As an extension of this argument, defendant contends that the authority delegated by the FHLBB to the OGC and ORPOS did not include the ability to guarantee against the risk of loss. The FHLBB's approval letter stated that OGC, ODB, and ORPOS approved "all of the aforesaid applications pursuant to the authority delegated by the [FHLBB] and the FSLIC in 12 C.F.R. §§ 546.2, 562.7, 563.22, 563.b28(c), and 574.8(b) . . . ." Pls.' Ex. 4. 12 C.F.R. § 563b.28(c) (1988), governing voluntary supervisory stock conversions, states:

> The Board delegates to the General Counsel or his designee, the authority to approve applications for voluntary supervisory conversions, and to *exercise the authority of the Board* pursuant to this section, provided that (1) the application does not present a significant issue of law or policy, and (2) that ORPOS does not raise supervisory objection to the application . . . .

12 C.F.R. § 563b.28(c) (emphasis added).

Because the government argues that the FHLBB lacked the statutory authority to guarantee a thrift holding company, such as El Paso, against the risk of regulatory change under 12 U.S.C. §§ 1729(f)(2)-(3), OGC and ORPOS could not, by delegation, gain authority exceeding that of the FHLBB to enter into such a contract with El Paso. Therefore, defendant contends that the ap-

proval letter signed by OGC and ORPOS guaranteeing against risk of loss exceeded any authority originally possessed by the Board. However, because the FHLBB and FSLIC's authority to provide financial assistance under sections 1729(f)(3) and 1725(c) included guaranteeing against the risk of regulatory change, the approval letter by OGC and ORPOS was not unauthorized. OGC and ORPOS were merely exercising the same statutory authority granted to the FHLBB and FSLIC. *Globe Savs.*, 55 Fed. Cl. at 260; *Hometown*, 53 Fed.Cl. at 335 n. 10; *Admiral*, 54 Fed.Cl. at 258.

In *Franklin*, 53 Fed.Cl. at 708, where a thrift holding company acquired a failing thrift through a supervisory conversion, the court held "the contract documents in this case, all of which were drafted by the Government, clearly indicate that the Bank Board and FSLIC officials with whom plaintiffs dealt in 1988 and 1989 were authorized to enter into a goodwill contract." The contract documents relied upon by the court include the very same type of documents involved in the El Paso transaction: a business plan conditioned on approval of requested forbearances, an application for supervisory conversion, an approval letter, a forbearance letter, and a dividend agreement. The approval letter issued in *Franklin* contains language that is almost identical to the one issued in the current case. The approval letter signed by OGC and the Office of Regulatory Activities ("ORA") stated that "pursuant to delegated authority to approve the applications noted herein, the Secretary or an Assistant Secretary of the [Bank] Board is hereby directed and authorized to issue to [Morristown] a letter concerning supervisory forbearances . . . ." *Id.* at 696. Pursuant to that delegated authority the Board's Acting Secretary issued a forbearance letter stating that "[f]or purposes of the reporting to the [Bank] Board, the value of any unidentifiable intangible assets resulting from accounting for the acquisition in accordance with the purchase method may be amortized by Franklin Federal Savings Bank over a period not to exceed 25 years by the straight line method." *Id.*

Relying on 12 U.S.C. § 1725(c), the *Franklin* court rejected the argument that an approval letter signed by OGC and ORA, pursuant to delegated authority from the FHLBB lacked statutory authority. *Id.* at 708. ("The Government's cavalier dismissal of 12 U.S.C. § 1725(c) as a 'housekeeping' statute does not square with the Supreme Court's reference to that statute in *Winstar III*.") As such, the court concluded that "the contractual undertaking between the Franklin Plaintiffs and the Government clearly includes a promise by Bank Board and FSLIC officials, acting with delegated authority, that Franklin Federal could amortize its supervisory goodwill over 25 years." *Id.* at 709. The approval letter in *Franklin* is indistinguishable from the approval letter issued under delegated authority by OGC and ORPOS to El Paso. In both cases, the FHLBB with statutory authority to guarantee against the risk of regulatory change under 12 U.S.C. §§ 1725(c)–1729(f), properly delegated its authority under the regulations.

In addition, plaintiffs' argument on the authority issue is strengthened by the fact that PSAs possess authority to bind the FHLBB to promises regarding the amortization of supervisory goodwill. *California Fed. Bank v. United States,* 39 Fed.Cl. 753 (1997) (*CalFed I*), *aff'd,* 245 F.3d 1342 (Fed.Cir. 2001) (*CalFed II*). In *Fifth Third Bank of W. Ohio v. United States,* 52 Fed.Cl. 637 (2002), the court examined the expansion of the district banks' authority to approve supervisory mergers. In upholding the PSA's authority, the court held that the "ability of the regional banks to make promises regarding the use of supervisory goodwill therefore was integral to fulfilling their role in FHLBB's policy to encourage the private acquisition of failing thrifts." *Id.* at 643. *See also Commercial Fed. Corp. v. United States,* 55 Fed.Cl. 595 (2003) (holding that PSA had implied authority to bind the FHLBB); *First Fed. Lincoln Bank v. United States,* 54 Fed.Cl. 446, 453 (2002) ("In accordance with the delegation regulations, the regional bank in this case had implied authority to bind itself to promises regarding amortization and use of goodwill toward regulatory capital."). Relying on this caselaw, plaintiffs contend that OGC and ORPOS were given greater authority because they were given control over "[a]ny other action which would otherwise be delegated to the Principle Supervisory Agent pursuant to paragraphs (a)(1) and (3) of this section." 12 C.F.R. § 574.8(b)(3)(ii) (1988).

The government also contends that OGC and ORPOS exceeded their authority delegated under 12 C.F.R. § 574.8(b) (1988). This provision, delegating authority to approve applications for acquisition of control of insured institutions, states:

> The Director of the Office of Examinations and Supervision with the concurrence of the General Counsel or their respective designees are authorized to take the following actions:
>
> (1) Approve any application or issue notice of intent not to disapprove any notice (i) which does not raise a significant issue of law or policy . . ., and (ii) which does not involve regulatory capital maintenance or dividend conditions that fail to conform to paragraph (a)(1)(iv) of this section.

12 C.F.R. § 574.8(b).

Defendant repeats its argument that the FHLBB lacked statutory authority to guarantee a holding company against the risk of regulatory change. Therefore, defendant argues that allowing OGC and ORPOS to make such a promise would raise a significant issue of law requiring them to seek approval directly from the Bank Board. Defendant submits that if El Paso "was not bound by the terms of the [RCMDA], which required it to ensure that [New El Paso] remained in compliance with present and future regulatory capital maintenance requirements, then the OGC and ORPOS exceeded their authority by approving [El Paso's] acquisition of [El Paso Federal]." Def.'s Cross–Mot. for Summ. J. at 42. However, as described above, the FHLBB's power to provide financial assistance in the form of a guarantee to a holding company acquiring control of an insured institution is clearly provided for under statutory authority. The May 1988 memorandum by OGC explicitly states:

> The Director of ORPOS, with the concurrence of OGC (or their respective designees), have been delegated authority to

approve the Application pursuant to 12 C.F.R. § 574.8(b), because (i) the subject application does not raise a significant issue of law or policy, and (ii) the regulatory capital maintenance and dividend limitation conditions involved are consistent with those set forth in 12 C.F.R. § 574.8(a)(1)(iv).

Pls.' Ex. 9. Furthermore, plaintiffs did not agree to bear the risk of regulatory change regarding the treatment of supervisory goodwill.

## VI. Risk of Regulatory Change ("Successor Regulation")

■ The government argues that even if the FHLBB had authority to enter into a contract, the RCMDA assigned the risk of regulatory change with regard to supervisory goodwill to plaintiffs. Defendant contends that El Paso agreed to provide additional capital if regulatory requirements changed and assumed the risk that the new regulations would prevent it from including supervisory goodwill as a capital asset. The government points to section VI.D. providing that:

> All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquiror's obligation under this Agreement.

Def.'s App. at 210. Under the RCMDA, section I.D., " 'Regulatory Capital' means regulatory capital defined in accordance with 12 C.F.R. § 561.13 or any successor regulation thereto." Def.'s App. at 207. "Regulatory Capital Requirement" is defined as "the Resulting Institution's regulatory capital requirement at a given time computed in accordance with 12 C.F.R. § 561.13(b), or any successor regulation thereto." Def.'s App. at 207, § I.E. The government relies upon these provisions as support for the contention that El Paso promised to bear the risk of regulatory change. Defendant explains that the Supreme Court recognized that:

> [E]ach side could have eliminated any serious contest about the correctness of their

interpretative positions by using clearer language. *See, e.g., Guaranty Financial Services, Inc. v. Ryan,* 928 F.2d 994, 999–1000 (C.A.11 1991) (finding, based on very different contract language, that the Government had expressly reserved the right to change the capital requirements without any responsibility to the acquiring thrift.)

*Winstar III,* 518 U.S. at 869 n. 15, 116 S.Ct. 2432. In *Guaranty,* the court interpreted "the forbearance provision to mean that the agencies would allow Guaranty to treat supervisory goodwill as regulatory capital so long as the regulatory [sic] remained as it was when the contract was signed.... But the agencies, at the same time they made that promise, also unambiguously warned Guaranty that rules might later change to Guaranty's detriment." 928 F.2d at 999. Defendant argues that the Regulatory Capital Maintenance Agreement ("RCMA") language in *Guaranty* is identical to the RCMDA issued in the present case. As such, the RCMDA shifted any risk of regulatory change from the government to El Paso.

First, as the *Franklin* court noted, "the reference to *Guaranty* in *Winstar III* was too fleeting and peripheral to be accorded precedential weight." 53 Fed.Cl. at 714. Secondly, this issue has been dealt with extensively by the Court of Federal Claims and has been consistently rejected. In fact, the "successor regulation" argument was one of the early common issues decided. *CalFed I,* 39 Fed.Cl. at 779 ("The court is required to follow the Supreme Court and reject Defendant's argument that 'successor regulation' language shifted the risk from the government to BF."). In *Winstar II,* the Federal Circuit held that the "stipulation by Winstar to maintain its regulatory net worth at whatever level the regulators set does not, however, eclipse the government's own promise that Winstar could count supervisory goodwill in meeting the regulatory requirements with which it had promised to comply." 64 F.3d at 1544. In *Castle v. United States,* 42 Fed.Cl. 859, 863–64 (1999), *vacated in part, aff'd in part and rev'd in part on other grounds,* 301 F.3d 1328 (Fed.Cir.2002), the court rejected a similar "successor regulation" defense:

Defendant would have the court accept an interpretation whereby a very specific provision of the agreement setting forth the unique means by which the thrift may meet its capital standards, and designed to induce capital investment in the thrift and to permit the thrift the flexibility in the near term to turn the fortunes of Western Empire around, could be destroyed at any time for any reason.

In *Castle*, the court found that specific language in the RCMA, identical to the RCMDA in this case, had to be read in light of the entire contract and harmonized with all of the forbearance provisions. 42 Fed.Cl. at 863–64. The court held that the most reasonable interpretation was that the government allowed plaintiffs to count supervisory goodwill toward its regulatory capital while permitting the government to adjust the minimum regulatory capital level. *Id.*

Plaintiffs contend that defendant's interpretation would violate the basic contract principle that an interpretation of a contract "must assure that no contract provision is made inconsistent, superfluous, or redundant." *Lockheed Martin IR Imaging Sys., Inc. v. West*, 108 F.3d 319, 322 (Fed.Cir. 1997); *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed.Cir.1983) ("An interpretation that gives reasonable meaning to all parts of the contract will be preferred to one that leaves portions of that contract meaningless . . . ."). Plaintiffs argue that the RCMDA "successor regulation" provision must be read in conjunction with the forbearance letter as part of the overall contract. *Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298, 1305 (Fed.Cir.1996) ("We read the language of a particular contractual provision in the context of the entire agreement . . . ."). The forbearance letter provided that:

> For purposes of reporting to the Board, the value of any unidentifiable intangible assets resulting from accounting for the merger in accordance with the purchase method may be amortized by New El Paso over a period not to exceed 25 years by the straight line method.

Pls.' Ex. 5. The forbearance letter went on to state:

> This letter does not and shall not be construed to constitute forbearance or waiver by the Board or the FSLIC with respect to any regulatory or other requirements *other than those encompassed within the preceding paragraphs (1) through (6)*. Other than the actions to enforce the regulatory requirements waived in accordance with paragraphs (1) through (6) and the statutory provisions authorizing imposition of the waived requirements, insofar as such requirements are waived, the Board and FSLIC expressly reserve all of their statutory rights and powers with respect to New El Paso . . . .

Pls.' Ex. 5 (emphasis added).

Plaintiffs persuasively argue that the specific language in the forbearance letter is part of the overall contract and takes precedence over the general language contained in the RCMDA. *Franklin*, 53 Fed.Cl. at 715 ("The court agrees with the plaintiffs' position that the specific language of the Forbearance Letter . . . takes precedence over the more general 'successor regulation' provision (Sec.VIII.D.) of the Dividend Agreement."); *Hometown*, 53 Fed.Cl. at 337; *Admiral*, 54 Fed.Cl. at 257. The forbearance letter specifically recognized the forbearance allowing New El Paso to report supervisory goodwill as amortizable regulatory capital for twenty-five years while reserving the government's right with regard to all other statutory powers. Thus, the forbearance letter specifically waived any regulatory requirements regarding New El Paso's use of supervisory goodwill. The "successor regulation" provision in the RCMDA recognized New El Paso's obligation to conform to existing regulatory capital requirements as well as any successor regulations except those that had been waived by the government in the forbearance letter. The forbearance letter did not waive the government's ability to set the minimum regulatory capital level but it did waive the government's right to exclude supervisory goodwill from the definition of regulatory capital. Therefore, defendant's interpretation of the RCMDA would render the forbearance agreement illusory. As the *Franklin* court concluded:

Thus, the Forbearance Letter and the "successor regulation" clause of the Dividend Agreement can be read in harmony as a contractual commitment by the Government permitting plaintiffs to count supervisory goodwill as amortizable regulatory capital for 25 years, regardless of any regulatory changes during that time, while preserving the Government's prerogative to change, by regulation, the minimum level of regulatory capital plaintiffs would be required to maintain . . . .

53 Fed.Cl. at 716.

In *Admiral*, 54 Fed.Cl. at 256–258, the court also rejected the argument that various provisions in the RCMA shifted the risk of regulatory change. As with the RCMDA in this case, the government had relied on a provision stating that "[a]ll references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that . . . such amendments may increase or decrease the Acquiror's obligation under this Agreement." *Id.* at 256. The forbearance letter issued in that case was also identical to El Paso's forbearance letter. *Id.* at 257 ("This letter does not . . . constitute forbearance or waiver by the Board or the FSLIC with respect to any regulatory or other requirements other than those encompassed within the preceding paragraphs."). After reviewing the forbearance letter, the court held that the successor regulation provision "should not be interpreted as exposing Admiral to the risk of sweeping changes in the bargained for method by which capital is accounted for by the FHLBB." *Id.*

The Court of Federal Claims has consistently held that successor regulation clauses do not trump the bargained for forbearances granted to the thrifts. *Sterling*, 53 Fed.Cl. at 614 ("[T]he successor regulation clause does not in any way purport to alter *Defendant's obligation* to allow Plaintiff to count goodwill . . . toward regulatory goodwill and amortize it over 12 years."); *Admiral*, 54 Fed.Cl. at 256 ("Given our understanding that the regulatory forbearances affecting supervisory goodwill were bargained for exchanges, we cannot accept the argument that Admiral also bargained away any ability to

enforce these promises."); *Globe Savs.*, 55 Fed.Cl. at 260–263; *Hometown*, 53 Fed.Cl. at 336–337; *Franklin*, 53 Fed.Cl. at 711–716; *S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 52 Fed.Cl. 531, 545–547 (2002) (*SoCal*). Defendant's attempts to distinguish the facts of this case from these previous decisions are unconvincing and are without merit.

## VII. Privity

### A. Hughes

■ In order to have standing to enforce a contract against the government, a plaintiff must have privity of contract. *Erickson Air Crane Co. v. United States*, 731 F.2d 810, 813 (Fed.Cir.1984) ("The government consents to be sued only by those with whom it has privity of contract . . . ."). If Hughes was a signatory to the contractual documents, he would have standing to bring a direct suit against the government. *Castle*, 301 F.3d at 1329. Plaintiff may also establish privity of contract through an implied-in-fact contract with the United States. *Maher v. United States*, 314 F.3d 600, 603 n. 1 (Fed.Cir.2002); *Bluebonnet Sav. Bank, F.S.B. v. United States*, 43 Fed.Cl. 69, 74 (1999) ("It is also of no moment that CFSB and Mr. Fail are shareholders, so long as the government breached duties owed them personally, and independently, of their status as shareholders."); *rev'd on other grounds*, 266 F.3d 1348 (Fed.Cir.2001).

■ According to defendant, the documents demonstrate that Hughes is simply a shareholder plaintiff who is neither a direct party nor a third-party beneficiary. *Glass v. United States*, 258 F.3d 1349 (Fed.Cir.2001). In *Glass*, the plaintiffs were the principal shareholders of the acquiring institution who also signed an RCMA personally obligating them to contribute capital to maintain its capital level. The Court of Federal Claims held that the "documentary evidence shows, however, that individually the four private plaintiffs did not contract for the regulatory treatment of goodwill arising from the acquisition; . . . ." 44 Fed.Cl. 73, 79 (1999). In support of its argument concerning Hughes, defendant also relies upon *FDIC ex rel.*

*Karnes County Sav. and Loan Ass'n v. United States,* 52 Fed.Cl. 503 (2002), *aff'd,* 342 F.3d 1313 (Fed.Cir.2003). The court found that investor plaintiffs in Karnes, a failed savings and loan, were not in privity with the government because they were not signatories to the documents underlying the transaction. *Karnes,* 52 Fed.Cl. at 507. Instead, "the letters were from the CEO of Karnes, who stated repeatedly that he was acting on behalf of the New Association." *Id.* Therefore, the Federal Circuit held that "the regulators undoubtedly were aware that the Lees were supplying the money that would be used to rehabilitate Karnes. Neither that knowledge, the supplying of the new capital, or the Lees' position as stockholders in Karnes, made them parties to those arrangements." *Karnes,* 342 F.3d at 1319.

The government asserts that Hughes was not a party to any contract regarding New El Paso's treatment of supervisory goodwill. Defendant points to the alleged contract documents and claims that none of them involve Hughes in his individual capacity. According to defendant's argument, the fact that Hughes dealt with the FHLBB in his capacity as president of El Paso does not mean that he was directly injured. For example, defendant notes that El Paso is listed as the applicant on the H-(e)1 acquisition application and Hughes signed the application as president of El Paso. Def.'s App. at 55. In the application, it states that "El Paso Holding Corporation, a Delaware corporation ('Applicant'), hereby requests approval . . . to acquire control of El Paso Savings and Loan Association . . . ." Def.'s App. at 60. The application provides that the "Applicant will be highly capitalized with Assets contributed by corporations and partnerships controlled by Mr. Hughes. . . . In addition, after the proposed acquisition of El Paso Savings, Mr. Hughes will serve as a management official of the Applicant and as Chairman of El Paso Savings." Def.'s App. at 76. According to the Supervisory Agent's digest, in consideration for El Paso's purchase of the thrift's stock, Hughes "will contribute partnerships and corporations he controls to capitalize

EPHC with certain parcels of real estate . . . . Immediately thereafter, EPHC will contribute these assets . . . to El Paso Savings." Pls.' Ex. 7. In addition, the other documents referred to by plaintiffs, such as the amendments to the application and the RCMDA were only signed by Hughes in his capacity as president of El Paso. Furthermore, the alleged acceptance contained in the approval letter was sent to Hughes in his capacity as president of El Paso. Therefore, defendant argues that Hughes was a mere shareholder who infused capital into the thrift and served as a management official.[8] Defendant also contends that the correspondence with the FHLBB regarding the treatment of supervisory goodwill was by an attorney representing Hughes Interests, an investment firm, instead of Hughes individually.

In *Bank of Am., F.S.B. v. United States,* the court held that investors in a holding company lacked the requisite privity because "the investors, in their dealings with the Bank Board, were not speaking for themselves but rather for their wholly owned corporation, HFH—a separate jural entity." 55 Fed.Cl. 670, 677 (2003). The plaintiffs had argued that they negotiated with the government, provided funding to recapitalize the thrift, and promised to maintain the thrift's net worth. However, the only obligation contained in the Bank Board's resolution regarding the individual plaintiffs was that they agreed in writing to follow the regulatory requirements regarding conflict of interest and transactions with holding companies. The court also found that the investor plaintiffs' personal guarantees to infuse additional capital as necessary were subsumed by the holding company's promise to do the same. *Id.* ("Had the investors been regarded as contracting parties in their own right, the routing of their personal guarantees, through HFH would have been unnecessary."). In response to the plaintiffs' reliance on certain cases for the principle that investors in a bank holding company who provide financial guarantees in support of a *Winstar*-related

---

**8.** Hughes owns 55% of the outstanding shares of El Paso. His two children own 20% each, and Mr. Scott Gregson owns 5%.

transaction are contracting parties, the court held:

> What these cases demonstrate is that in order for a shareholder to be considered a party to the underlying transaction, the shareholder's participation not only must be essential to the transaction, but also must be acknowledged in the form of a written promise, sought by and made directly to the government, that is formally recognized to constitute a part of the parties' overall undertaking.

*Id.* (Footnote omitted).

In *Franklin*, 53 Fed.Cl. at 717–18, the court found that investors in Franklin Financial, a holding company, were in privity with the Bank Board because the approval letter set forth obligations that they had to fulfill in their individual capacities. In addition to cash paid by the shareholders, the holding company infused $4.5 million provided by a bank loan. The shareholders were required to personally guarantee payment of the holding company's $4.5 million loan to acquire the thrift's stock. The shareholders signed a "Shareholder Agreement to Service Holding Company Debt" obligating them to pay an amount equal to their pro rata interests in the holding company if the dividends paid by the new thrift to Franklin Financial were not enough to satisfy the debt. The approval letter also required the shareholders and the holding company to agree, in writing, to infuse additional capital to the thrift to ensure that it complied with the minimum capital requirements. Therefore, the court held that "the goodwill contract imposed duties on the individual shareholders, and the holding company they owned, for which the shareholders were personally liable." *Id.* at 718. In *So-Cal*, the court held that investors in a holding company had standing because they had signed documents, incorporated into the assistance agreement by an integration clause, obligating them to infuse additional capital to maintain the thrift's capital requirements. 52 Fed.Cl. at 534–36. Although the plaintiffs had not signed the Assistance Agreement, they were parties to the RCMA guaranteeing that they would personally infuse an additional $5 million into the thrift if its capital fell below a certain level.

Hughes contends that he negotiated directly with the government, whereby, in exchange for certain regulatory forbearances he agreed to acquire El Paso Federal by purchasing subdebt, providing property which he personally guaranteed would provide income to the thrift and executing a promissory note for the $10 million in Series A subordinated notes. In an Agreement of Obligation dated May 27, 1988, signed by Hughes individually and the FHLBB, it provided:

> In Connection with the supervisory conversion application filed by Alfred D. Hughes and El Paso Holding Company to acquire El Paso Savings Association ("Obligee"), Alfred D. Hughes ("Obligor") has agreed to contribute to Obligee his interests in twelve (12) federally subsidized low income apartments . . . .
>
> 1. Obligor agrees to undertake the following obligation:
>
> A. For each of the next ten (10) fiscal years of the Obligee commencing with the fiscal year 1988, Obligor guarantees that the Combined Cash Flow from the properties shall not be less than One Million Dollars ($1,000,000) per fiscal year.
>
> B. Obligor agrees to provide management services for the Properties during such time as the Obligor owns the Properties at rates currently authorized by the respective housing authorities. In the event that the FHLBB removes the Obligor from the management of any Property or Properties (i) the obligations of the Obligor hereunder as to each respective Property or Properties shall cease; and (ii) the Obligor, Obligee and the Supervisory Agent of the FHLBB shall mutually reduce the Combined Cash Flow to reflect the cessation of Obligor's obligation as to each respective Property or Properties.
>
> . . . .
>
> 7. To the extent necessary to insure compliance of Obligor with the Obligations stated in paragraph 1 above, the FHLBB shall have the right but not the obligation to enforce the Obligor's Obligations hereunder on behalf of the Obligee. The FHLBB joins in this Agreement of Obligation for the sole purpose of acknowl-

edging its enforcement right and for no other purpose whatsoever and by its execution hereof assumes no liabilities or obligations of the Obligee hereunder." Pls.' App. at A229. Therefore, the document signed by both Hughes and the FHLBB specifically referred to Hughes as an acquiror. In addition, this agreement personally obligated him, above and beyond the obligations of El Paso, to ensure that these properties generated $10 million in revenue for the thrift. The agreement acknowledged that Hughes was bound to the thrift and the FHLBB by this promise and that the FHLBB could take action to enforce the guarantee. The government's internal memoranda confirm its understanding of Hughes' personal obligation. The Supervisory Agent's digest stated that "in connection with the supervisory conversion application filed by EPHC, the controlling stockholder of EPHC, Alfred Hughes, has agreed to contribute his interests in 12 federally subsidized low income apartments mentioned above." Pls.' Ex. 7. The digest also acknowledged that "in order to provide assurance of the creditworthiness of these properties to the [FHLB–Dallas], Mr. Hughes has agreed to execute a guarantee that the cash flow from these properties shall not be less than $1,000,000 per fiscal year." Pls.' Ex. 7. Thus, the government in reviewing the application, required Hughes to personally guarantee a certain amount of cash flow from the properties and provide management services in exchange for granting the requested forbearances.

In addition, the promissory note personally obligated Hughes to repurchase the subdebt from the Steiner Partnerships and demonstrates that he was a party to the goodwill contract. On March 10, 1988, a letter to OGC describing Amendment No. 2 to the H-(e)1 application provided that "El Paso Federal will issue $11.5 million of twelve year subordinated debentures as part of its voluntary supervision conversion and acquisition by El Paso Holding." Pls.' App. at A251. According to the amendment "Alfred D. Hughes, shall individually purchase $1.5 million ($1,500,000) Series B 10.00% Subordinated Note of El Paso Federal." Pls.' App. at A251. The May 1988 OGC memoranda con-

firms that the Steiner Partnerships will "purchase 100,000 shares of the Series A subordinated debt for an aggregate purchase price of $10,000,000 in cash." Pls.' Ex. 9. In the May 11, 1988 internal FHLB–Dallas memoranda, the Supervisory Agent stated that as "the proposed debt issuance meets all of the criteria of Section 563.8–1 of the Insurance Regulations, we have no objection to the inclusion of the proceeds from this issuance in regulatory capital and therefore recommend approval of the application . . . ." Pls.' Ex. 25. Specifically, the Supervisory Agent noted that the "net cash proceeds from the sale of the notes will be utilized to strengthen the regulatory capital position of El Paso Federal in connection with the voluntary supervisory conversion . . . ." Pls.' Ex. 25. The FHLBB approval letter referred to issuance of the subdebt by requiring El Paso to get approval "to include in the New Institution's Regulatory Capital the proposed $11.5 million worth of subordinated debentures to be issued in connection with the transaction . . . ." Pls.' Ex. 4.

The Series A subordinated notes issued by New El Paso to the Steiner Partnerships were non-voting twelve year notes with an interest rate of 9.2%. In the event of default, the debenture note holders could demand full repayment unless the payment would result in a failure by New El Paso to meet minimum regulatory capital requirements. Pls.' Ex. 9. The subordinated notes had "a minimum maturity of twelve years from issuance with interest payable quarterly." Pls.' Ex. 25. The promissory note signed by Hughes provided that he agreed to pay $10 million "with interest thereon from date hereof until maturity at the rate of Nine and two-tenths percent (9.2%) per annum; interest payable at the rate of 9.2% per annum in four equal installments on the first business day of January, April, July, and October in each year, and accruing at the rate of .72% per annum until maturity." Pls.' App. at A312. Additionally, the promissory note provided that "upon default in the punctual payment of this note or any part thereof, principal or interest, as the same shall become due and payable, the entire indebtedness secured by the hereinafter lien shall be matured . . . ." Pls.'

App. at A313. The promissory note was a personal guarantee on the subordinated notes obligating Hughes individually to pay the $10 million owed to the Steiner Partnerships. *See Holland v. United States,* 57 Fed. Cl. 540 (2003) (holding that a put agreement by the principal owners of the acquiring institution with the purchasers of the subordinated notes was a personal guarantee).

Additionally, Hughes points to various correspondence and government memoranda summarizing his involvement in early negotiations. In a July 23, 1987 letter from the lawyer for Hughes Interests to FHLB–Dallas, it stated that "on behalf of our client, Hughes Interests, please find enclosed a draft of the proposed Agreement and Plan of Merger and Supervisory Conversion. . . . We would ask that you permit El Paso Federal to enter into this Agreement and Plan of Merger and Supervisory Conversion with Hughes Interests." Pls.' Ex. 13. Plaintiff also refers to a subsequent July 24, 1987 meeting attended by the attorney for Hughes Interests, the Managing Director of Hughes Interests, and the Supervisory Agent to "discuss recapitalization (a noncash capital contribution totaling $50 million by Mr. Alfred Hughes)." Pls.' Ex. 14. An internal FHLB–Dallas memorandum describing the meeting stated that El Paso Federal "has located an investor, Hughes Interests, a diversified investment firm based in Austin, Texas. The transaction involves a $50 million noncash capital contribution." Pls.' Ex. 15. Thus, the contemporaneous documents demonstrate the government's contractual intent with respect to the personal guarantees made by Hughes in his individual capacity. *See also Westfed Holdings, Inc. v. United States,* 52 Fed.Cl. 135, 145 (2002) ("A shareholder of a thrift, who is a party to a contract for regulatory treatment of the thrift may sue to enforce the contract, notwithstanding that the contract's promises are nominally made to the thrift rather than the shareholder.").

B. El Paso

Defendant argues that El Paso was not a contracting party because the forbearance letter was addressed to El Paso Federal and not El Paso. Therefore, if El Paso's H-(e)1 application is held to be an offer, the forbearance letter cannot be an acceptance of that offer because it was directed to a separate party. Instead, the government contends El Paso Federal is the only party in privity with the forbearance promise. Plaintiffs argue that the parties contracted for regulatory forbearances to be issued to the thrift in exchange for El Paso agreeing to acquire control of the thrift.

As discussed earlier, the forbearance letter is part of the overall contract between plaintiffs and the FHLBB regarding El Paso's acquisition and supervisory conversion of El Paso Federal. The FHLBB approval letter explicitly recognizes El Paso as an applicant for approval of the acquisition of the failing thrift through its subsidiary, New El Paso. Pls.' Ex. 4. ("We have also completed our review of the applications filed by the Acquirors and the New Institution . . . for approval of the Acquiror's acquisition of control of the New Institution, and of the Old Institution by merger . . . ."). The H-(e)1 application, filed with FSLIC to obtain control of El Paso Federal, was plaintiffs' offer. The government's acceptance, contained in the FHLBB approval and forbearance letters, set forth several obligations on the part of El Paso and the FHLBB. First, it required El Paso to purchase common stock in exchange for contributing certain parcels of real estate. Second, it required the FHLBB to enter into a forbearance agreement with El Paso Federal.

Thus, the approval letter authorizing FHLBB to issue such a forbearance letter reflects the reciprocal obligations contracted for by both parties. El Paso also acknowledged its obligation to maintain regulatory capital and infuse additional capital as necessary. Def.'s App. at 207, RCMDA, § II. In *Home Sav. of Am., F.S.B. v. United States,* 51 Fed.Cl. 487 (2002), the court held that the holding company, H.F. Ahmanson & Co., was in privity with the government because it had negotiated directly with the regulators to acquire the target banks through its subsidiary and promised to maintain the net worth of its subsidiary after the acquisition. As such, the holding company "does not merely

have shareholder standing. It was an essential participant in each of these acquisition transactions." *Id.* at 499. Having contracted for the regulatory forbearances to be issued to the thrift and agreeing to the RCMDA, El Paso has standing to enforce the government's promise regarding New El Paso's regulatory forbearances.

Plaintiffs' argument is supported by the documentary evidence referring to El Paso's request for the regulatory forbearances. As stated in Article 8.07 of the Merger Plan entered into by El Paso, Hughes and El Paso Federal, the transaction is conditioned on the approval of the requested forbearances. The request for forbearances is included in the H-(e)1 application. In the ORPOS executive summary, it notes that *"EPHC has requested the following forbearances* in connection with this transaction; ... amortization of goodwill arising from the purchase accounting, for regulatory purposes, by use of the straight line method over a twenty five (25) year period." Pls.' Ex. 8 (emphasis added). In the May 1988 OGC memorandum, it provides that ORPOS has approved six forbearances, including "for purposes of reporting to the Board, the value of any goodwill resulting from the application of purchase accounting in accounting for the acquisition may be amortized by *El Paso Holding Corporation* over a 25 year period by the straight line method." Pls.' Ex. 9 (emphasis added).

Finally, the Federal Circuit recently held that a FHLBB's forbearance letter issued to a thrift constituted a counteroffer to the holding company's application to acquire the thrift. *First Commerce,* 335 F.3d at 1381–82. The Federal Circuit did not look favorably upon the claim that the forbearance letter could not be a counteroffer because it was addressed to the thrift and not the holding company, remarking "treating the FHLBB's forbearance letter as a counteroffer fits the transaction neatly into the mold of a unilateral contract, in which the government promised favorable accounting treatment in exchange for First Commerce's performance of acquiring Mutual Federal." 335 F.3d at 1382 n. 5. Specifically, the Circuit noted that "[e]ven if we ignore the ample references to First Commerce in the forbearance letter, we cannot ignore the government's brief to this court, which states, 'the FHLBB also issued a letter granting FCC several standard forbearances ....' " 335 F.3d at 1382. Similarly, the forbearance letter issued in this case states that the forbearances are being granted "in connection with the approval by the [FHLBB] of the voluntary supervisory conversion of [El Paso Federal] to a state-chartered stock association and merger of El Paso with and into New El Paso ...." Pls.' Ex. 5. Because El Paso's application to acquire El Paso Federal, FHLBB's approval letter, the forbearance letter, and the RCMDA are part of the contract, it is clear that El Paso is in privity with the government.

## VIII. Damages

■ Plaintiffs assert that they are entitled to restitution damages in the amount of $46.5 million, which includes the $35 million in real property and $11.5 million in cash contributed to the thrift. In support of their restitution theory, plaintiffs rely upon *Landmark Land Co. v. United States,* 46 Fed.Cl. 261, 267 (2000) (awarding plaintiffs restitution for the value of cash and real property contributed to the thrift), *aff'd in part and rev'd in part on other grounds,* 256 F.3d 1365 (Fed. Cir.2001). Plaintiffs contend that the appraised value of the amount contributed is undisputed. However, defendant now disputes the true value of both the cash and real property. The government argues that the $46.5 million is merely the agreed upon equity amount and not the true market value of the contribution made by the plaintiffs. The government contends that it is prepared to put forth evidence that the appraisals are not reliable and that plaintiffs' retrospective appraisals are flawed. Defendant also disputes plaintiffs' claim to restitution for $11.5 million in cash contributions. Because a genuine dispute of material fact exists regarding the exact value of the cash and real properties contributed by plaintiffs, summary judgment on the amount of damages is inappropriate and more suited for trial.

## CONCLUSION

Accordingly, it is **ORDERED:**

(1) Plaintiffs' Motion for Summary Judgment filed March 22, 1991 insofar as it seeks liability for breach of contract is GRANTED;

(2) Plaintiffs' Motion for Entry of Judgment on Plaintiffs' Unopposed Motion for Summary Judgment filed February 18, 2000 is **DENIED AS MOOT**;

(3) Defendant's Cross–Motion for Summary Judgment filed October 10, 2000, insofar as its seeks summary judgment on liability for breach of contract is **DENIED**;

(4) The parties are directed to consult and prepare a Status Report(s) to be filed no later than November 24, 2003, proposing the further proceedings required in order to resolve the remaining issues in this matter.