# United States Court of Appeals for the Federal Circuit

04-5137, -5138

FRANKLIN FEDERAL SAVINGS BANK, and FRANKLIN FINANCIAL GROUP, INC.,

Plaintiffs-Cross Appellants,

and

GEORGE O. HAGGARD, JR., BEN B. JARNAGIN, RICHARD C. JESSEE,
A. EUGENE JOLLEY, JEAN S. KEENER,
GEORGE R. McGUFFIN, and CHARLES G. ROBINETTE,

Plaintiffs-Cross Appellants,

v.

UNITED STATES,

Defendant-Appellant.

Eric W. Bloom, Winston & Strawn LLP, of Washington, DC, argued for plaintiffs-cross appellants. With him on the brief for George O. Haggard, Jr., et al. were Thomas M. Buchanan and Charles B. Klein. Of counsel on the brief for Franklin Federal Savings Bank, et al. was Thomas R. Dyer, Wyatt, Tarrant & Combs, LLP, of Memphis, Tennessee.

William F. Ryan, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, Elizabeth A. Holt and John H. Roberson, Trial Attorneys. Of counsel were Delisa M. Sanchez and Marc S. Sacks.

Appealed from: United States Court of Federal Claims

Judge Nancy B. Firestone

# United States Court of Appeals for the Federal Circuit

04-5137, -5138

FRANKLIN FEDERAL SAVINGS BANK, and FRANKLIN FINANCIAL GROUP, INC.,

Plaintiffs-Cross Appellants,

and

GEORGE O. HAGGARD, JR., BEN B. JARNAGIN, RICHARD C. JESSEE,
A. EUGENE JOLLEY, JEAN S. KEENER,
GEORGE R. McGUFFIN, AND CHARLES G. ROBINETTE,

Plaintiffs-Cross Appellants,

v.

UNITED STATES,

Defendant-Appellant.

_____

DECIDED:  December 14, 2005

_____

Before CLEVENGER, RADER, DYK, <u>Circuit Judges</u>.

Opinion for the court filed by <u>Circuit Judge</u> DYK.  Dissenting opinion filed by <u>Circuit Judge</u> RADER.

DYK, <u>Circuit Judge</u>.

This is a <u>Winstar</u> breach of contract case. <u>See</u> <u>United States v. Winstar Corp.</u>, 518 U.S. 839 (1996).  The primary question on appeal is whether, under our decision in <u>Admiral Financial Corp. v. United States</u>, 378 F.3d 1336 (Fed. Cir. 2004), the thrift entities, Franklin Federal Savings Bank ("Franklin Federal") and Franklin Financial

Group, Inc. ("Franklin Financial") assumed the risk of regulatory change resulting from the enactment of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183. (We refer to Franklin Federal and Franklin Financial together as "Franklin.") A subsidiary question is whether there was a contractual or third party beneficiary relationship with the government that would confer standing on the shareholders of the thrift holding company, Franklin Financial (hereinafter the "Seven Shareholders"). We conclude that Admiral governs, and that the thrift entities assumed the risk of regulatory change. Thus we do not reach the subsidiary question of shareholder standing. We accordingly reverse the judgment of the Court of Federal Claims.

BACKGROUND

I

Morristown Federal Savings and Loan Association ("Morristown") was a federal mutual savings association, or "thrift." Franklin Fed. Sav. Bank v. United States, 53 Fed. Cl. 690, 693 (2002) ("Franklin I"). Morristown was one of many thrifts that became undercapitalized when "the combination of high interest rates and inflation in the late 1970's and early 1980's brought about a . . . crisis in the thrift industry." Winstar, 518 U.S. at 845. By the end of 1987 Morristown had a negative net worth of $3.536 million. Franklin I, 53 Fed. Cl. at 694.

The Federal Savings and Loan Insurance Corporation ("FSLIC") was responsible for insuring thrift deposits and regulating federally insured thrifts. Rather than allowing thrifts like Morristown to fail, FSLIC encouraged ailing thrifts and healthy thrifts to merge in a series of "supervisory mergers." The thrifts desired to use the "purchase" method of

04-5137, -5138                           2

accounting, under which the newly created thrift could designate the excess of the purchase price over the fair value of all acquired assets as an intangible asset called "supervisory goodwill," and claim it as an asset for purposes of computing regulatory capital. The purchase method of accounting "permit[ted] the acquiring entity to designate the excess of the purchase price over the fair value of all identifiable assets acquired as an intangible asset called 'goodwill' . . . . Goodwill recognized under the purchase method as the result of an FSLIC-sponsored supervisory merger was generally referred to as 'supervisory goodwill.'" Winstar, 518 U.S. at 848-49. The thrifts were often permitted to amortize this goodwill over an extended period of time. Id. at 851.

Under then-current regulations, it was uncertain whether regulators would permit the use of this method for computation of regulatory capital. Id. at 855 ("[I]t was not obvious that regulators would accept purchase accounting in determining compliance with regulatory criteria, and it was clearly prudent to get agreement on the matter."). To assure that these acquisitions would comply with existing regulatory requirements, FSLIC often gave the newly created thrift express permission to use the purchase method of accounting and to count the supervisory goodwill toward its reserve capital requirements. Id. at 847-48. In some cases the government's regulatory forbearance was not reflected in a contract with the thrift and did not create government liability for a change in accounting treatment. See, e.g., D & N Bank v. United States, 331 F.3d 1374, 1382 (Fed. Cir. 2003). In others, the special accounting treatment was part of a contract between the thrift and the government. See, e.g., Winstar, 518 U.S. 839; Fifth Third Bank of W. Ohio v. United States, 402 F.3d 1221 (Fed. Cir. 2005). In such cases,

the contract typically, but not always, imposed liability on the government if it subsequently adopted more restrictive regulations. See Winstar, 518 U.S. 839; Fifth Third, 402 F.3d 1221; Admiral, 378 F.3d 1336.

In response to Morristown's financial problems, the Federal Home Loan Bank Board ("Bank Board"), which had authority to act on behalf of FSLIC, recommended by letter in December 1987 that Morristown's board of directors seek to merge with another thrift in a supervisory merger. Morristown prepared a business plan in May 1988, under which Morristown would be acquired by Franklin Financial, a holding company formed by Morristown's board of directors. Under the plan, FSLIC would permit the new thrift to count Morristown's supervisory goodwill as an intangible asset. On June 7, 1988, Morristown submitted this plan with its application for supervisory conversion to the Bank Board. On November 21, 1988, the Bank Board formally issued a conditional "Approval Letter" to the board of directors of Morristown and Franklin Financial. The Approval Letter conditioned the Bank Board's approval of the transaction on Franklin Financial's executing an agreement, called the Dividend Agreement,[1] and on the Seven Shareholders' personally guaranteeing the $4.5 million loan. In a section entitled "Supervisory Forbearances," the Approval Letter provided that "the Secretary or an Assistant Secretary of the Board is hereby directed and authorized to issue to the Institution a letter concerning supervisory forbearances." (J.A. at A200443.) A

---

[1] The Approval Letter stated that "the Acquiror is hereby authorized to acquire control of the Institution, provided that . . . . [p]rior to the consummation of the transaction, the Acquiror shall enter into an agreement with the FSLIC, substantially in the form attached hereto as 'Voting and Disposition Rights/ Dividend Agreement' . . . ." (J.A. at A200441.)

Forbearance Letter, which would become effective upon approval of the transaction, was issued on the same date as the Approval Letter.

On January 12, 1989, Franklin Financial and the Bank Board executed the Dividend Agreement. The signatories of the Dividend Agreement were Franklin Financial and FSLIC. The premise of the Dividend Agreement was that the government would take favorable action approving the acquisition. It stated that Franklin Financial's agreement was "in consideration of the FSLIC acting favorably on the Application [for approval of the transaction]." (J.A. at A200467.) The FSLIC's favorable action with respect to the application included the FSLIC's approval of Franklin Financial's request for regulatory forbearance, as reflected in the Forbearance Letter. In the Forbearance Letter the Bank Board allowed Franklin Federal to treat the supervisory goodwill of Morristown as an intangible asset, amortizable over 25 years.

The Dividend Agreement also included section VIII(D), which provided that "[a]ll references to regulations . . . shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquiror's obligation under this Agreement." The key question on appeal is whether the "successor regulation" language in section VIII(D) placed the risk of regulatory change on Franklin.

The Dividend Agreement also prohibited Franklin Financial from accepting from Franklin Federal any dividend that would cause Franklin Federal's regulatory capital to fall below the regulatory capital trigger, and provided that if Franklin Federal's capital fell below the trigger for more than 30 days, it would be subject to immediate seizure. The Dividend Agreement had an integration clause that stated that "[t]his agreement,

together with any understanding agreed to in writing by the parties, constitutes the entire agreement between the parties . . . ." (J.A. at A200475.)

The Seven Shareholders were not parties to the Dividend Agreement but were parties to two separate agreements with the Bank Board relating to the supervisory transaction. First, the shareholders and the Bank Board signed a "Shareholder Agreement to Service Holding Company Debt," which obligated the shareholders to service the $4.5 million debt in the event dividends paid from Franklin Federal to Franklin Financial, were insufficient. Second, the shareholders, Franklin Financial and the Bank Board signed a "Capital Infusion Agreement," requiring the shareholders to provide additional capital if Franklin's capital fell below regulatory requirements within 30 days after the conversion.

Pursuant to the plan, on January 12, 1989, Morristown converted from a mutual association to a stock company, changed its name to Franklin Federal, and issued $5 million of common stock to Franklin Financial. In exchange for the stock, Morristown/Franklin Federal received a $5 million cash infusion from Franklin Financial. To finance the purchase of Franklin Federal's stock, Franklin Financial issued stock to its shareholders (the Seven Shareholders) for a total price of $500,000 in cash. Franklin Financial borrowed the remaining $4.5 million from a local commercial bank. This loan was secured personally by the Seven Shareholders, who planned to service the debt using dividends paid from Franklin Federal to Franklin Financial, and then from Franklin Financial to the Seven Shareholders. According to an independent auditor's report issued on March 10, 1989, after the transaction Franklin Federal's goodwill totaled $9,391,291.

Eight months after the acquisition and the execution of the Dividend Agreement, Congress enacted FIRREA, which limited the ability of thrift institutions to count supervisory goodwill towards their regulatory capital requirements.[2]  Winstar, 518 U.S. at 856-60.  Under these new capital standards, Franklin Federal's regulatory capital fell below the minimum capital requirement, and it became an insolvent thrift, subject to immediate seizure. Because the Dividend Agreement prevented Franklin Federal from issuing dividends when its regulatory capital fell below minimum requirements, the Seven Shareholders allege that they were forced to service Franklin Financial's $4.5 million debt from their personal assets.  In order to meet the new capital standards, Franklin Financial raised money through stock offerings to new shareholders.  These offerings to outsiders diminished the Seven Shareholders' ownership in Franklin Financial from 100% to 62.3%.  Franklin I, 53 Fed. Cl. at 703.  As a consequence, when the Seven Shareholders later exchanged their stock in Franklin Financial for stock of another company in a merger, they claimed that they received less than 100% of the value of Franklin Financial.

In 1992, Franklin Federal, Franklin Financial, and the Seven Shareholders filed suit in the Court of Federal Claims, alleging that the passage of FIRREA resulted in the breach by the government of a contract incorporating a Forbearance Letter, which "promis[ed] that Franklin Federal Savings Bank could treat supervisory goodwill as an

---

[2]     FIRREA recognized two forms of regulatory capital requirements, "tangible capital" and "core capital."  It prevented thrifts from counting any supervisory goodwill towards their "tangible capital" requirement, and allowed thrifts to count goodwill toward their "core capital" requirement only according to a phase-out schedule.  Franklin I, 53 Fed. Cl. at 700.

asset, amortizable over 25 years, for the purposes of satisfying regulatory capital requirements." Franklin I, 53 Fed. Cl. at 690, 692. Pertinent to this appeal, the government argued, first, that there was no contractual agreement with respect to goodwill and that the Bank Board lacked authority to enter into a binding goodwill contract as part of an "unassisted" acquisition (i.e., an acquisition that did not involve financial assistance from the government). Id. at 708-09. Second, the government argued that, even if there was a contract, it was not breached by the enactment of FIRREA because section VIII(D) of the Dividend Agreement assigned the risk of regulatory change to the thrift entities. Id. at 711-12. Third, the government argued that the Seven Shareholders lacked standing because they were not direct parties to any of the core contractual documents and were not third party beneficiaries.

On summary judgment, the Court of Federal Claims rejected the government's argument that there was no contractual agreement and that the Bank Board officials lacked authority to enter into a goodwill contract in connection with an "unassisted" acquisition. It found that the Dividend Agreement was a binding contract, and, contrary to the government's arguments, that the Dividend Agreement's integration clause, section VIII(K), incorporated the Forbearance Letter and Approval Letter into that contract. Franklin I, 53 Fed. Cl. at 705-06. The court rejected the government's argument that the Dividend Agreement assigned the risk of regulatory change to the thrift entities, finding that "the specific language in the Forbearance Letter . . . takes precedence over the more general 'successor regulation' provision (Sec.VIII.D.) of the Dividend Agreement." Id. at 715. In the court's view, the "successor regulation" language in section VIII(D) permitted the government to change the level of regulatory

capital, but not the <u>method</u> by which it was calculated. <u>Id.</u> at 716. It found that the contract had been breached by the enactment of FIRREA, because FIRREA altered the method of calculation of regulatory capital. <u>Id.</u> The Court of Federal Claims' decision was rendered before our recent decision in <u>Admiral Financial Corp. v. United States</u>, 378 F.3d 1336 (Fed. Cir. 2004), in which we held that a provision identical to section VIII(D) assigned the risk of regulatory change to the thrift.

The Court of Federal Claims found that the Seven Shareholders had standing to sue the government because they were parties to the "goodwill contract." <u>Franklin I</u>, 53 Fed. Cl. at 717-18. Although the Seven Shareholders were not signatories of the Dividend Agreement and were not recipients of the Forbearance Letter, they were nonetheless parties to the goodwill contract because the core documents imposed duties on them. In particular, the Approval Letter conditioned approval of the merger on the Seven Shareholders' personally guaranteeing Franklin Financial's $5 million debt. Hence, the government was liable not only to Franklin Federal and Franklin Financial but also to the individual shareholders. <u>Id.</u>

Following its liability decision, the trial court issued two opinions with respect to damages, the first on summary judgment before trial and the second after trial. <u>Franklin Fed. Sav. Bank v. United States</u>, 55 Fed. Cl. 108 (2003) ("<u>Franklin II</u>"); <u>Franklin Fed. Sav. Bank v. United States</u>, 60 Fed. Cl. 55 (2004) ("<u>Franklin III</u>"). Final judgment was entered on April 22, 2004, and awarded damages of $217,630.79 to Franklin Financial, $109,016.83 to Franklin Federal, and $470,060 to the Seven Shareholders. <u>Franklin III</u>, 60 Fed. Cl. at 61, 73.

The government appeals, challenging the Court of Federal Claims' liability and standing determinations. The plaintiffs cross-appeal certain aspects of the trial court's damages determinations.

DISCUSSION

I

In order to prevail in a <u>Winstar</u> case a plaintiff with standing must establish that a contract existed with the government whereby the government was "contractually bound to recognize the supervisory goodwill and [particular] amortization periods." <u>Winstar Corp. v. United States</u>, 64 F.3d 1531, 1541-42 (Fed. Cir. 1995), <u>aff'd</u>, 518 U.S. 839 (1996). On appeal, the government is prepared to assume that a contract existed, and argues that, if there was a contract, it placed the risk of regulatory change on the thrift entities rather than the government. Despite the government's concession, we must nonetheless determine the nature of the contract before determining its effect.

The mere issuance of the Approval Letter and the Forbearance Letter by the government did not, of course, create a contract between Franklin and the government. In <u>D & N Bank</u>, the plaintiff similarly relied on a Bank Board Resolution conditioning approval of the merger on submission of an analysis of the effect of the special accounting method. 331 F.3d at 1378-79. We rejected the argument that such regulatory approval created a contract. <u>Id.</u> at 1379; <u>see also</u> <u>First Commerce Corp. v. United States</u>, 335 F.3d 1373 (Fed. Cir. 2003) (refusing to find a contract based on regulatory approval alone); <u>Anderson v. United States</u>, 344 F.3d 1343 (Fed. Cir. 2003) (same). More recently we recognized that "mere approval of a merger by FHLBB,

acting solely in its regulatory capacity, [does] not create contractual obligations . . . ." Fifth Third, 402 F.3d at 1234.

Here it is particularly plain that the regulatory approvals did not themselves constitute a contract. Throughout the period of negotiation it was clear that the parties contemplated that there would not be agreement absent the Dividend Agreement. The Approval Letter specifically was conditioned on execution of the Dividend Agreement. Nor did the integration clause of the Dividend Agreement incorporate the regulatory approvals. The integration clause of the Dividend Agreement itself provided that the Dividend Agreement would "supersede[ ] all prior agreements and understandings of the parties in connection with the subject matter hereof" save "any understanding in writing by the parties."[3] The Approval Letter and Forbearance Letter were not "written" agreements signed by the parties, and were not characterized as such in the Dividend Agreement.[4] They were not agreements in and of themselves but merely regulatory

---

[3] The integration clause provided:

This Agreement, together with any understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with the subject matter hereof.

(J.A. at 200475.)

[4] Our prior cases holding integration clauses incorporated Forbearance Letters and Approval Letters invoked different language that explicitly incorporated the Letters. In Winstar, for example, a Supervisory Assistance Agreement ("SAA") for the Glendale transaction provided:

This Agreement . . . constitutes the entire agreement between the parties thereto and supersedes all prior agreements and understandings of the parties in connection herewith, excepting only the Agreement of Merger and any resolutions or letters issued contemporaneously herewith . . . .

approvals that could only become enforceable by the mechanism of the Dividend Agreement. Whatever oral agreements that might have been reached were expressly superseded by the Dividend Agreement. Thus, while the Dividend Agreement created a contract between Franklin and the government, contrary to the decision of the Court of Federal Claims, the integration clause of the Dividend Agreement did not incorporate the Approval and Forbearance Letters into the Dividend Agreement.

Nonetheless we agree that the Dividend Agreement created a goodwill contract that obligated the government to comply with the Forbearance Letter's authorization to "[amortize] the value of any unidentifiable intangible assets resulting from accounting for the acquisition in accordance with the purchase method . . . over a period not to exceed 25 years by the straight line method [for purposes of reporting to the Board]." (J.A. at 200445.) There was a contract here between the government and Franklin with respect to goodwill because the government in the Dividend Agreement clearly promised to issue the Approval Letter and Forbearance Letter (and indeed had already done so conditionally) in exchange for Franklin's undertakings in the Dividend Agreement. The Dividend Agreement identified itself as a "contract made under and governed by Federal law," stated that "the Acquiror [was] willing to enter into [the] Agreement in order that the FSLIC [would] act favorably upon the [Application for approval of the acquisition]," and provided that Franklin Financial's agreement to maintain Franklin

---

Winstar, 64 F.3d at 1540 (emphasis in original); see also Winstar, 518 U.S. at 862 (plurality opinion). Other cases involve substantially similar language. See, e.g., S. Cal. Fed. Sav. & Loan Ass'n. v. United States, 422 F.3d 1319, 1329 (Fed. Cir. 2005); Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 n.11 (Fed. Cir. 2004) (see Barron Bancshares, Inc. v. United States, 53 Fed. Cl. 310, 316 n.10 (2002), for the full integration clause); Cienega Gardens v. United States, 194 F.3d 1231, 1246 n.12 (Fed. Cir. 1998).

Federal's regulatory capital was "in consideration of the FSLIC acting favorably on the Application [for approval]." (J.A. at A200467, A200474.)

In the language of basic contract law, the Dividend Agreement reflected a bargained-for exchange between the government and Franklin Financial. Restatement (Second) Contracts § 17 (1981) ("Except as stated in Subsection (2), the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration."); see also id. at § 3 ("A bargain is an agreement to exchange promises or to exchange a promise for a performance or to exchange performances."). Franklin Financial promised to maintain the regulatory capital of Franklin Federal. In return, the government promised to "act favorably upon [Franklin's] Application." (J.A. at A200467.) "Favorable action" required the government to permit the acquisition to occur, and pursuant to the Forbearance Letter, to waive regulatory requirements.

We therefore conclude that the Dividend Agreement created a binding agreement with respect to the regulatory treatment of goodwill.

II

We turn then to the central question--whether that contract placed the risk of regulatory change on the government.

The Supreme Court addressed this question in Winstar itself. In Winstar, a primary focus of the various Supreme Court opinions was on the unmistakability doctrine--that is, whether the contracts should be presumed to promise only temporary forbearance (until regulatory change occurred) or long-term forbearance. The plurality held that the unmistakability doctrine did not apply in actions seeking to recover

monetary damages for breach of contract, and that there thus was no presumption that the contracts promised temporary forbearance only. Winstar, 518 U.S. at 887, 910. The particular contracts were construed as promising long-term forbearance. Id. at 861. But, as we shall see, the plurality agreed that clear language in such contracts could limit the promise to temporary forbearance and shift the risk of regulatory change to the thrift. Justice Scalia's concurrence urged that the unmistakability doctrine applied to such contracts, but that the agreements did not shift the risk of regulatory change to the thrifts. Id. at 920-21. Justice Scalia indeed believed that a promise for temporary forbearance was illusory, and would render the contracts unenforceable. Id. at 921. The dissent urged that the unmistakability doctrine applied and that the contracts should be construed as promising only temporary forbearance even without the clear language demanded by the plurality. Id. at 929-30, 937.

Franklin urges that we treat Justice Scalia's opinion as binding and hold that a contract for temporary regulatory forbearance is illusory. See Pls.' Br. at 29-30 (quoting Winstar, 518 U.S. at 921). In our view Justice Scalia's position, far from representing the majority view, itself is a minority view on this particular issue.

The plurality and the dissent agreed that the parties could have contracted only for temporary forbearance, but disagreed as to whether a clear statement was necessary. Because the plurality required a clear statement to legitimate a temporary forbearance, its view is narrower than the dissent, which found binding temporary forbearance without the need for a clear statement. We must treat the narrower view as the holding of the Court. See Commonwealth Edison Co. v. United States, 271 F.3d

04-5137, -5138                                      14

1327, 1339 (Fed. Cir. 2001) (en banc); cf. Marks v. United States, 430 U.S. 188, 193 (1977).

The Winstar plurality pointed to Guaranty Financial Services, Inc. v. Ryan, 928 F.2d 994, 999 (11th Cir. 1991), as an example of a case in which the presumption in favor of long-term forbearance was rebutted. Winstar, 518 U.S. at 869 n.15.[5] There, Guaranty Financial Services, Inc. and FSLIC entered into a written agreement entitled "Regulatory Capital Maintenance/Dividend Agreement," which incorporated by reference a forbearance letter. Guaranty, 928 F.2d at 996. The Dividend Agreement contained a risk shifting provision, section VI(D), which stated:

> All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquiror's obligation under this Agreement.

Id. at 999. The Eleventh Circuit held that section VI(D) of the Dividend Agreement gave Guaranty the right to treat supervisory goodwill as regulatory capital only for so long as

---

[5]     The plurality stated in full:

> To be sure, each side could have eliminated any serious contest about the correctness of their interpretive positions by using clearer language. See, e.g., Guaranty Financial Services, Inc. v. Ryan, 928 F.2d 994, 999-1000 (11th Cir. 1991) (finding, based on very different contract language, that the Government had expressly reserved the right to change the capital requirements without any responsibility to the acquiring thrift). The failure to be even more explicit is perhaps more surprising here, given the size and complexity of these transactions. But few contract cases would be in court if contract language had articulated the parties' postbreach positions as clearly as might have been done, and the failure to specify remedies in the contract is no reason to find that the parties intended no remedy at all. The Court of Claims and Federal Circuit were thus left with the familiar task of determining which party's interpretation was more nearly supported by the evidence.

statutes and regulations governing the area remained as they were when the agreement was signed. Id. The court held that this provision "unmistakably warn[ed] Guaranty that its obligations under the contract may be increased by subsequent regulation." Id.

Consistent with and citing the Winstar plurality view, we held in Admiral that the same contract language that was at issue in Guaranty placed the risk of regulatory change on the thrift. Admiral, 378 F.3d at 1342. Admiral is factually identical to Guaranty. In 1988, Admiral Financial Corporation acquired a failing thrift, Haven Federal Savings and Loan, pursuant to a Bank Board resolution. Admiral and the Bank Board executed a Dividend Agreement that "bound Admiral to maintain a certain level of capital in Haven," and subjected Admiral to default if Haven's capital level fell below the trigger for more than 90 days. Id. at 1338. In connection with approval of the transaction, the Bank Board sent a forbearance letter permitting Admiral to amortize goodwill over a 25 year period. The Dividend Agreement in Admiral contained a risk shifting provision identical to the Dividend Agreement here. Id.

In Admiral, we held that the Dividend Agreement's risk-shifting clause placed the risk of regulatory change on the thrift. In other words, the provision in Admiral, like section VI(D) in Guaranty, overcame the presumption that the promises contained in the forbearance letter were absolute. In Admiral, we explicitly rejected the Court of Federal Claims' interpretation of the relevant language that appeared both in the Dividend Agreement in Admiral and that appears in the Dividend Agreement here. We found that the risk-shifting provision "[did] not limit those changes to increasing or decreasing the

Winstar, 518 U.S. at 869 n.15.

<u>level</u> of capital that thrifts must maintain, as opposed to changing the accounting methods the Bank Board requires." <u>Admiral</u>, 378 F.3d at 1341 (emphasis added).

In our later decision in <u>Hometown Financial Inc. v. United States</u>, 409 F.3d 1360 (Fed. Cir. 2005), we distinguished <u>Admiral</u> and found that a dividend agreement did not shift the risk of regulatory change to the thrift. <u>Hometown</u>, 409 F.3d 1367-68. Although the agreement in <u>Hometown</u> contained a risk shifting provision identical to the Dividend Agreement in <u>Admiral</u>, the Hometown agreement contained additional language that "specifically identified how the forbearances should be treated." <u>Id.</u> at 1367-68.[6] Relying on this additional language, the court found that the plaintiffs did not assume the risk of regulatory change. The Dividend Agreement here lacks the additional language that distinguished <u>Hometown</u> from <u>Admiral</u>.

In fact, both parties here agree the contract language in <u>Admiral</u> is identical in all material respects to the language of the contract before us. Article VIII(D) of the Franklin Dividend Agreement provided:

> All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being

---

[6]     Section I(E) of the regulatory maintenance agreement in <u>Hometown</u> provided:

> "Regulatory Capital Requirement" means the Institution's regulatory capital requirement at a given time computed in accordance with 12 C.F.R. § 561.13(b), or any successor regulation thereto, <u>except that during the five-year period following consummation of the acquisition of the Institution, the Regulatory Capital Requirement of the Institution shall take into account forbearances granted by the FHLBB by letter dated December 22, 1987 and those granted by the Principal Supervisory Agent of the Federal Home Loan Bank of Indianapolis by letter dated April 1, 1988.</u>

<u>Hometown</u>, 409 F.3d at 1367 (emphasis added). The agreements in <u>Admiral</u> and in the present case lack the specific references to forbearances in the "except that" clause.

expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquiror's obligation under this Agreement.

The risk-shifting clause in the Admiral Dividend Agreement, article VI(D), was identical.

Similarly, the language in the Forbearance Letters in the two cases was identical in all material respects. The May 4, 1988, letter in Admiral provided, in pertinent part:

For purposes of reporting to the Board, the value of any intangible assets resulting from the application of push-down accounting in accounting for the purchase, may be amortized by Haven for a period not to exceed 25 years by the straight-line method.

Admiral Fin. Corp. v. United States, 54 Fed. Cl. 247, 251 (2002). The Forbearance Letter to Morristown/Franklin Federal provided:

For purposes of reporting to the Board, the value of any unidentifiable intangible assets resulting from accounting for the acquisition in accordance with the purchase method may be amortized by Franklin Federal Savings Bank over a period not to exceed 25 years by the straight line method.

(J.A. at A200445.) [7]

Given the virtual identity in language, Admiral would appear to govern. However, Franklin urges that we need not follow Admiral here. We conclude that the arguments for declining to follow Admiral are not persuasive.

First, Franklin argues that Admiral is inconsistent with our en banc decision in Winstar v. United States, 64 F.3d 1531 (Fed. Cir. 1995). In Winstar, we rejected the government's argument that the regulatory maintenance agreement in that case shifted the risk of regulatory change to the thrift. Approval of the Winstar merger was

---

[7] The Dividend Agreement in Admiral contained the same language that we rely on today to find a goodwill contract. It stated that Admiral's agreement to maintain regulatory capital of Haven was "in consideration of the FSLIC approving the acquisition . . . ." Admiral, 378 F.3d 1336 (J.A. at A400034).

conditioned on Winstar's filing a "Net Worth Maintenance Stipulation," which required Winstar to maintain its "net worth . . . at a level consistent with that required by . . . Insurance Regulations, as now or hereafter in effect . . . ." See Winstar, 518 U.S. 839 (J.A. at 78). The government argued that this agreement "required Winstar to abide by any changes in the law regarding regulatory capital." Winstar, 64 F.3d at 1544. The court agreed that Winstar was obligated to "maintain its capital at levels set by the bank regulators," but found that this agreement did not "eclipse the government's . . . promise that Winstar could count supervisory goodwill [towards maintaining whatever capital level the regulators set]." Id. In other words, the agreement required the obvious-- adherence to future regulatory requirements--but did not shift the risk of regulatory change to Winstar. Admiral was different. Section VI(D) of the Admiral Dividend Agreement made it "expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquiror's obligation under this Agreement." Admiral, 378 F.3d 1339. We held that this quite different language was sufficient to shift the risk of regulatory change. Hence, Admiral was entirely consistent with our en banc decision in Winstar.

Second, Franklin, relying on Justice Scalia's Winstar concurrence, argues that the contract here must be construed not to place the risk of regulatory change on the thrift entities, because construing the contract to place the risk on the thrift entities would render the contract illusory. Franklin asserts that no similar problem existed in Admiral because there there was consideration not present in this case. Franklin's reliance on the Winstar concurrence is misplaced, because as noted above, the plurality and the dissent rejected this view. Under Winstar, a promise for a regulatory waiver

until regulatory change occurs is plainly sufficient consideration. Further, both here and in <u>Admiral</u> there is other consideration--the government's agreement to approve of the transaction. Here as in <u>Admiral</u> the agreements are not illusory.

Finally, Franklin argues that the <u>Admiral</u> court did not consider the effect of additional language in the Forbearance Letter that appeared after the goodwill forbearance. The Forbearance Letter stated that it "shall not be construed to constitute forbearance . . . with respect to any regulatory or other requirements other than those [specified in the Forbearance Letter] . . . ." (J.A. at A200445). Franklin contends that the "regulatory or other requirements" that were waived should be construed to refer to both current <u>and future</u> regulatory requirements. Franklin achieves this result by treating the Forbearance Letter as part of the Dividend Agreement, and subject to its definitions, and by relying on the Dividend Agreement's statement that "all references to regulations . . . in this Agreement <u>shall include any successor regulations thereto</u> . . . ." (J.A. at A200474 (emphasis added)). Franklin thus argues that because the Dividend Agreement says "regulations" includes "successor regulations," we must interpret "regulatory requirements" in the Forbearance Letter to include the "future regulatory requirements."

The gist of Franklin's argument here is that <u>Admiral</u> overlooked an argument that would have disposed of the issue of liability in favor of the thrift. Franklin thus candidly asserts that <u>Admiral</u> was wrongly decided and that we should reconsider it.

We are skeptical that <u>Admiral</u> can or should be disregarded simply because it failed to discuss Franklin's new argument. In any event, we conclude that Franklin's new argument, apparently raised for the first time on appeal, is without merit. As we

have discussed above, the Dividend Agreement and Forbearance Letter were not part of a single integrated document. While we construe the two together to ascertain the intent of the parties, there is no basis for assuming, as Franklin asks us to do, that the precise definitions of the Dividend Agreement are applicable to the Forbearance Letter.[8] To treat the Dividend Agreement's definition of the word "regulation" as applicable to the Forbearance Letter's different terminology ("regulatory requirement") is unwarranted, particularly since this would create a conflict between the two documents. This is not a situation, as in Hometown, where additional language in the Dividend Agreement itself clearly contradicted section VIII(D). Absent such a clear conflict within the Dividend Agreement itself, section VIII(D) must govern. Admiral held that language placed the risk of regulatory change on the thrift.

We conclude that here as in Admiral the "successor regulations" clause of the Dividend Agreement placed the risk of regulatory change on the thrift entities.

CONCLUSION

For the forgoing reasons, we conclude that the Dividend Agreement shifted the risk of regulatory change to the thrift entities, and Franklin cannot recover for damages resulting from the changes in regulatory capital requirements wrought by the enactment of FIRREA. Because we decide that Franklin may not recover on the contract, we need not reach the issue of shareholder standing to enforce the alleged promise. Accordingly, we reverse the judgment of the Court of Federal Claims.

---

[8] "It is important to note that even though several instruments relating to the same subject and executed at the same time should be construed together in order to ascertain the intention of the parties, it does not necessarily follow that those instruments constitute one contract or that one contract was accordingly merged in or

<u>REVERSED</u>

COSTS

No costs.

---

unified with another so that every provision in one becomes a part of every other." 4 <u>Williston on Contracts</u> § 30:26 (4th ed. 1990).

# United States Court of Appeals for the Federal Circuit

04-5137,-5138

FRANKLIN FEDERAL SAVINGS BANK, and FRANKLIN FINANCIAL GROUP, INC.,

Plaintiffs-Cross Appellants,

and

GEORGE O. HAGGARD, JR., BEN B. JARNAGIN, RICHARD C. JESSEE,
A. EUGENE JOLLEY, JEAN S. KEENER,
GEORGE R. McGUFFIN, and CHARLES G. ROBINETTE,

Plaintiffs-Cross Appellants,

v.

UNITED STATES,

Defendant-Appellant,

RADER, Circuit Judge, dissenting.

The court today goes too far in its reliance on Admiral Financial Corp. v. United States, 378 F.3d 1336 (Fed. Cir. 2004); it relies on silence for authority and fails to consider the importance of the integration clause in this case, which was not present in Admiral. Because the contract between the Government and Franklin did not shift the risk of regulatory changes to Franklin, and because Admiral does not compel otherwise, I respectfully dissent.

In Admiral, although not necessary for its affirmance of the United States Court of Federal Claims, the court entertained the Government's alternative ground for affirmance, i.e., that article VI(D) of the contract between Admiral and the Government ("the successor regulations clause") shifted the risk of future regulatory changes to Admiral. Admiral, 378 F.3d at 1339. Admiral does not discuss the Forbearance Letter,

or any integration clause in the Dividend Agreement that might have incorporated language from the Forbearance Letter into the Dividend Agreement. In fact, Admiral is silent on the very issue for which the court today finds it dispositive, i.e., whether language in the Forbearance Letter issued to Franklin was sufficient, by virtue of an integration clause in the Dividend Agreement, to prevent the successor regulations clause from shifting the risk of regulatory changes to Franklin. The court summarizes Franklin's argument: "The gist of Franklin's argument here is that Admiral overlooked an argument that would have disposed of the issue of liability in favor of the thrift. Franklin thus candidly asserts that Admiral was wrongly decided . . . ." To the contrary, a different decision on the risk-shifting issue in Admiral would not have affected the outcome of that case. In Admiral the Court of Federal Claims found that the Government breached its agreement with Admiral, but that Admiral sustained no damages. Id. This court affirmed, agreeing that Admiral had sustained no damages, but further holding that the successor regulations clause of the Dividend Agreement shifted the risk of future regulatory changes to Admiral. Id. at 1345. The court today places too much emphasis on Admiral's silence.

An opinion of this court is precedent only for those issues it discusses. See, e.g., Nat'l Cable Television Assoc., Inc. v. Am. Cinema Editors, Inc., 937 F.2d 1572, 1580 (Fed. Cir. 1991) ("When an issue is not argued or is ignored in a decision, such decision is not precedent to be followed in a subsequent case in which the issue arises.") (citing Webster v. Fall, 266 U.S. 507, 511 (1925)); Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co., 272 F.3d 1365, 1378 (Fed. Cir. 2001) (Dyk, J., concurring-in-part and dissenting-in-part) ("We have recognized that a decision applying a particular rule is not binding

precedent if the issue was not discussed by the court.") (citing Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1346 (Fed. Cir. 2001)). Thus, the court's observation that the Admiral record included a Forbearance Letter does not resolve this case because Admiral does not discuss the effect of that letter on the overall agreement. Moreover, while the Forbearance Letter in the Admiral record is essentially the same as that in this case, the Admiral Dividend Agreement lacked an integration clause like the one in the Dividend Agreement between Franklin and the Government. Compare Joint Appendix at A400034-041, Admiral, (No. 03-5168), with Joint Appendix, Vol. II, at A200475. That distinction is significant.

The Court of Federal Claims found that "[t]he Approval Letter and the Forbearance Letter were both written understandings between the parties within the meaning of Sec. VIII.K. [i.e., the integration clause] of the Dividend Agreement, and therefore integrated into the contract." Franklin I, 53 Fed. Cl. at 707. The court today apparently disagrees: "[W]hile the Dividend Agreement created a contract between Franklin and the government, contrary to the decision of the Court of Federal Claims, the integration clause of the Dividend Agreement did not incorporate the Approval and Forbearance Letters into the Dividend Agreement." Nevertheless, the court goes on to explain: "[W]e agree that the Dividend Agreement created a goodwill contract that obligated the government to comply with the Forbearance Letter's authorization [regarding intangible assets]." The court's reasoning supporting that logical about-face is nothing short of baffling. Despite its purported reliance on "basic contract law," the court today distorts that "basic" law.

The integration clause in the Dividend Agreement states:

> This Agreement, together with any understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with the subject matter hereof.

Joint Appendix at A200475. The Dividend Agreement does not mention any regulatory forbearance. Instead, the Bank Board adopted that forbearance in the earlier Forbearance Letter. Joint Appendix at A200445. Thus, the Dividend Agreement either integrates the Forbearance Letter, or supersedes it, by virtue of the integration clause. If the Forbearance Letter was integrated, as the Court of Federal Claims concluded, then all of its language was integrated, including the sentence upon which Franklin relies when arguing that the regulatory forbearance applies to future regulations. On the other hand, if the Forbearance Letter was not integrated, then the contract between the Government and Franklin does not include any regulatory forbearance at all because the Dividend Agreement mentions none. Somehow the court today concludes that part of the Forbearance Letter became part of the contract, while another part of that same letter did not.

In my view this case is closer to <u>Hometown Financial, Inc. v. United States</u>, 409 F.3d 1360 (Fed. Cir. 2005), than to <u>Admiral</u>. As in <u>Hometown</u>, the contract in this case contained additional language, not considered in <u>Admiral</u>, that required the regulatory forbearance to apply to future regulations. Specifically, the Forbearance Letter refers to "the regulatory requirements waived in accordance with paragraph 1 and the statutory provisions authorizing imposition of the waived requirement." Joint Appendix, at A200445. For the reasons discussed above, that language is a part of the overall contract between Franklin and the Government. Because that contract clearly establishes the parties' intent, i.e., that references to regulations include successor

04-5137,-5138                                    4

regulations, the Government's promised forbearance of regulatory capital requirements applies to successor requirements. The court seems to dismiss this construction of the contract, at least in part, because the Dividend Agreement refers to "regulations" while the Forbearance Letter refers to "regulatory requirements." That is a distinction without a difference that simply cannot carry the weight placed on it by this court. Thus, because I also agree with the Court of Federal Claims' reasoning that the Seven Shareholders had standing to sue the Government, I would affirm.

Aside from the particular contract analysis vagaries in today's opinion, this court's Winstar jurisprudence in general is more confusing with every opinion. Admittedly, this court's task is not an easy one. It must decide the appeals before it on some basis, and unfortunately, that basis is frequently the slight variations in the wording of the various documents in each Winstar case. But as a result, this court's opinions are putting tremendous weight and emphasis on terms and distinctions among those terms that, in my view, were not on the "radar" of the drafters. As a result, it is now impossible to draw a straight line connecting the reasoning of this court's Winstar opinions. Today's analysis is a perfect example of that problem. Admiral decided an issue that, by its own admission, was unnecessary to resolve the appeal. Perhaps because of the non-critical nature of that issue, Admiral did not consider arguments that either may have been made, or could have been made. The court is now left to deal with the difficult task of divining meaning from that opinion.

Nearly a decade has passed since the Supreme Court issued its Winstar decision. In that time, the issues have only become murkier and the decisions less predictable. Our jurisprudence is not well served when, after so many years of litigation,

so many appellate decisions, and so much evidence of the parties' intent at the time these thrifts were failing, our decisions rest on a distinction between "regulations" and "regulatory requirements."