# United States Court of Appeals for the Federal Circuit

2006-5112, -5118

ALFRED D. HUGHES,

Plaintiff-Appellee,

and

EL PASO HOLDING CORPORATION,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

John K. Villa, Williams & Connolly LLP, of Washington, DC, argued for plaintiff-appellee and plaintiff-cross appellant. Of counsel on the brief were David S. Blatt, Ryan T. Scarborough, Richard A. Olderman and Dov P. Grossman.

Kenneth M. Dintzer, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. On the brief was Stuart E. Schiffer, Deputy Assistant Attorney General. Of counsel on the brief were Jeanne E. Davidson, Director, William F. Ryan, Assistant Director, and Arlene Pianko Groner, Trial Attorney.

Appealed from: United States Court of Federal Claims

Senior Judge James F. Merow

# United States Court of Appeals for the Federal Circuit

2006-5112, -5118

ALFRED D. HUGHES,

Plaintiff-Appellee,

and

EL PASO HOLDING CORPORATION,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

_____

DECIDED: August 29, 2007

_____

Before MAYER, RADER, and MOORE, Circuit Judges.

MOORE, Circuit Judge.

The United States appeals three holdings in two decisions of the Court of Federal Claims in this Winstar breach of contract case. Hughes v. United States, 58 Fed. Cl. 291 (2003) (Hughes I); Hughes v. United States, 71 Fed. Cl. 284, 287 (2006) (Hughes II). First, the government challenges the court's conclusion that an individual corporate officer, Alfred Hughes (Hughes), had standing to sue for breach of contract. Second, the government challenges the court's conclusion that Hughes did not assume the risk

of regulatory change resulting from the enactment of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), Pub. L. No. 101-73, 103 Stat. 183. Third, the government challenges the amount and propriety of damages awarded to Hughes. Appellee El Paso Holding Corporation (EPHC) cross-appeals the Court of Federal Claims' holding that EPHC assumed the risk of regulatory change and therefore could not recover for the government's alleged breach of its contract with EPHC.

We conclude that there was only one overall contractual agreement with the government in this case, and that agreement shifted the risk of regulatory change to the private parties. We therefore affirm the Court of Federal Claims' holding that the government was not liable to EPHC for its breach of the agreement by enacting FIRREA. To the extent that Hughes was a party to the agreement, he too assumed the risk of regulatory change. We therefore reverse the court's judgment finding the government liable to Hughes and awarding Hughes damages based on that liability.

BACKGROUND

El Paso Federal Savings and Loan Association (Old El Paso) was a Federal mutual savings association or "thrift." In the mid 1980's, Old El Paso "was one of many thrifts that became undercapitalized when 'the combination of high interest rates and inflation in the late 1970's and early 1980's brought about a . . . crisis in the thrift industry.'" Franklin Fed. Sav. Bank v. United States, 431 F.3d 1360, 1361 (Fed. Cir. 2005) (citing United States v. Winstar, 518 U.S. 839, 845 (1996)). Hughes entered into an Agreement and Plan of Merger and Supervisory Conversion (Merger Agreement) with Old El Paso, pursuant to which Old El Paso would be merged into El Paso Savings Association (New El Paso). The resulting thrift would be a wholly-owned subsidiary of

EPHC. Hughes II, 71 Fed. Cl. at 287. Hughes created EPHC to hold New El Paso's stock, and Hughes became EPHC's president and majority shareholder. The Merger Agreement contemplated that Hughes and EPHC would acquire Old El Paso in exchange for 14 real estate parcels valued at $47.3 million and $11.5 million cash. Id. at 287. The Merger Agreement had several conditions precedent, notably, the "[a]mortization of goodwill arising from purchase method accounting, for regulatory purposes, by use of the straight-line method over a 25-year period." Id.

On August 18, 1987, EPHC filed the Merger Agreement as part of an Application for approval of the merger with the Federal Home Loan Bank Board (FHLBB). Id. at 288. The Application, which was signed by Hughes as President of EPHC, detailed that Hughes would cause the fourteen real estate parcels to be contributed to the capitalization of the merged company. Id. During the review and negotiation process, the FHLBB agents focused on the value of the proposed contribution of these real estate parcels. Id. at 299-301. Hughes was heavily involved with the agents' investigation, providing them with necessary information relating to ownership and valuation. Id. at 300. The FHLBB was particularly concerned that twelve of the fourteen parcels were low-income housing apartments. Id. at 301. To ease this concern, the head FHLBB agent made Hughes agree: (1) to personally guarantee that a yearly rental income of $1 million for these properties would flow to the thrift; (2) that Hughes would continue to manage the properties; and (3) that the properties would not be sold for less than book value without regulatory consent. Id. at 301. With these guarantees in place, the parties agreed on a $35 million valuation of the real estate contribution. These guarantees were subsequently reduced to writing in an Agreement of Obligation.

On May 13, 1988, the FHLBB issued an Approval Letter to the Boards of Directors for EPHC and Old El Paso. The Approval Letter notified the companies of FHLBB's approval of Old El Paso's conversion from a mutual savings and loan to a stock-chartered thrift as well as EPHC's Application to acquire control of the thrift. On the same day, FHLBB also issued a Forbearance Letter, addressed to the President of Old El Paso, granting the merged entity certain supervisory forbearances. Id. at 289-90. Most notably, the Forbearance Letter included a goodwill accounting forbearance permitting "the value of any unidentifiable intangible assets resulting from accounting for the merger in accordance with the purchase method [to be] amortized by New El Paso over a period not to exceed twenty five (25) years."

On the closing date for the merger, May 27, 1988, Hughes personally signed the Agreement of Obligation as Obligor, and he signed on behalf of New El Paso as Obligee. The FHLBB also signed the Agreement of Obligation, but its role was specifically limited to the right to enforce the obligations on behalf of New El Paso.

On the same day, EPHC and the Federal Savings and Loan Insurance Corporation (FSLIC) executed a Regulatory Capital Maintenance Dividend Agreement (Dividend Agreement). The Dividend Agreement provided that "in consideration of the FSLIC approving the acquisition of control of El Paso Federal . . . [EPHC] will cause the Regulatory Capital of [New El Paso] to be maintained at a level at or above the Regulatory Capital Requirement and as necessary, will infuse sufficient additional capital . . . to effect compliance with such requirement." According to the Dividend Agreement's definitions, "'Regulatory Capital Requirement' means the Resulting Institution's regulatory capital requirement at a given time computed in accordance with

12 C.F.R. § 563.13(b), or any successor regulation thereto." The Dividend Agreement also included a Miscellaneous Provision that stated "[a]ll references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquiror's obligation under this Agreement."

After the closing, Old El Paso converted from a mutual to stock-form of ownership and EPHC acquired Old El Paso and merged the thrift into New El Paso. In addition, Hughes caused the real estate parcels and cash capitalization to occur, although not precisely as contemplated in the Application.[1] Regulators reviewing the transaction agreed that it was "complete and acceptable" in accordance with the requirements in FHLBB's Approval Letter.

Just over a year after the El Paso conversion and merger transaction, Congress enacted FIRREA, which limited the ability of thrift institutions to count supervisory goodwill towards their regulatory capital requirements. See Winstar, 518 U.S. at 856-60. Under these new capital standards, New El Paso's regulatory capital fell below the

---

[1] According to the Application, EPHC was to obtain the fourteen real estate parcels from their owners, and EPHC was to contribute the parcels to Old El Paso in exchange for stock. Instead, the owners of thirteen of the parcels passed the real estate directly to Old El Paso in exchange for stock. The final parcel, which constituted half of Tract B of the Steiner Ranch, was sold by Mr. Steiner to Old El Paso for $11.5 million. Also according to the application, $10 million of the $11.5 million cash capitalization, was originally to come from an unrelated company, PasoTex. However, when Hughes uncovered illegal conduct by officials for that company, he amended the proposal for a cash contribution, proposing Mr. Steiner would purchase $10 million in Series A stock. After the application was approved, Hughes sought and received regulatory approval to purchase the stock in his own name, rather than having Mr. Steiner purchase it, in order to avoid potentially adverse tax treatment. Hughes funded this purchase by borrowing money from Mr. Steiner.

required levels.  Hughes II, 71 Fed. Cl. at 291.  Regulators informed New El Paso that it would be out of capital compliance on December 7, 1989 (the effective date of the FIRREA-implementing regulations).  Id.  New El Paso was directed "to *immediately* discontinue including supervisory goodwill" in its capital calculation.  Id. at 291-92.  On September 7, 1990, New El Paso remained far below the capital requirements, and the Office of Thrift Supervision placed New El Paso in a receivership with significant operating restrictions.  New El Paso was subsequently liquidated.  Id. at 292.

Hughes and EPHC filed a complaint in the Court of Federal Claims on September 5, 1990, alleging that the government's enactment of FIRREA constituted a breach of contract between the plaintiffs and the government, which allowed New El Paso to count goodwill toward its regulatory capital requirements.  After the Supreme Court's 1996 decision in Winstar, the Court of Federal Claims originally granted both plaintiffs' motions for summary judgment as to liability.  Hughes I, 58 Fed. Cl. at 313. The court thereafter conducted a trial on damages and reconsidered its earlier decision as to liability based upon two intervening decisions from this court: Admiral Financial Corp. v. United States, 378 F.3d 1336 (Fed. Cir. 2004), and Franklin Federal Savings Bank v. United States, 431 F.3d 1360 (Fed. Cir. 2005).  In Hughes II, the court determined based on our precedent that the government was not liable to EPHC because EPHC assumed the risk of regulatory change in the Dividend Agreement.  71 Fed. Cl. at 292-93.  The court held, however, that Hughes was not bound by the Dividend Agreement, and therefore, did not assume the risk of regulatory change.  Id. at 324.  The Court of Federal Claims awarded Hughes $46.5 million in damages for the value of real estate and cash that he caused to be contributed to the thrift.

This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

DISCUSSION

I.

The first issue for this court to address is whether EPHC assumed the risk of regulatory change. The Court of Federal Claims determined that "[u]nder binding Federal Circuit precedent, [EPHC] agreed to bear the risk that regulatory capital requirements could change both in amount and in constituent components." Hughes II, 71 Fed. Cl. at 321. Whether parties to a contract agreed to put the risk of regulatory change squarely on one party is a question of law that we review de novo. Hometown Fin., Inc. v. United States, 409 F.3d 1360, 1366 (Fed. Cir. 2005).

In Admiral, the parties executed a Regulatory Capital Maintenance/Dividend Agreement containing the following Miscellaneous provision, which is identical to one in the Dividend Agreement in this case:

> All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquiror's obligation under this Agreement.

378 F.3d at 1339. This court interpreted the provision as risk-shifting, stating "by agreeing to the clause, Admiral acknowledged that its obligations might change if the regulatory regime changed." Id. We held that "Admiral assumed the risk of a regulatory change such as that brought about by FIRREA," and thus, Admiral could not recover damages based on the government's enactment of FIRREA and the implementing regulations. Id. at 1343. In Franklin, this court applied its Admiral holding, concluding that because the risk-shifting clause in the Dividend Agreement and the promises

regarding goodwill in the Forbearance Letters were identical to those found in <u>Admiral</u>, the plaintiffs assumed the risk of regulatory change. <u>Franklin</u>, 431 F.3d at 1369.

In this case, we are bound by our decisions in <u>Admiral</u> and <u>Franklin</u>. The government's promises regarding goodwill forbearances are the same here as in <u>Admiral</u> and <u>Franklin</u>. The clause that this court held was risk-shifting in <u>Admiral</u> and <u>Franklin</u> is identical to a clause in the Dividend Agreement executed by EPHC. There is nothing in the Dividend Agreement in this case to distinguish it from that in <u>Admiral</u> and <u>Franklin</u>. <u>Cf.</u> <u>Hometown</u>, 409 F.3d at 1365-66, 1369 (holding that the risk of regulatory change with respect to the goodwill forbearances did not shift to the plaintiff because the goodwill promises were specifically excluded from the Dividend Agreement provisions that shifted the risk of regulatory change).

In its cross-appeal, EPHC attempts to distinguish <u>Admiral</u> and <u>Franklin</u> on the ground that the only consideration given by the government to EPHC was the goodwill forbearance and that if the government could retract this at any time, it was an illusory promise. In contrast, EPHC argues that <u>Admiral</u> was premised on the fact that the government had provided other adequate consideration and that in <u>Franklin</u>, the plaintiffs admitted that regulatory approval of the transaction constituted consideration— a fact that EPHC has not conceded in this case. EPHC's attempt to distinguish <u>Franklin</u> is unconvincing for two reasons. First, this court in <u>Franklin</u> already addressed and rejected the illusory promise argument, stating that "[u]nder <u>Winstar</u>, a promise for a regulatory waiver until regulatory change occurs is plainly sufficient consideration." <u>Franklin</u>, 431 F.3d at 1370. Second, although EPHC has not conceded that regulatory approval constitutes consideration, this court in <u>Franklin</u> held that such approval is

adequate consideration.  Id.  As in Franklin, the Dividend Agreement in this case states that EPHC is agreeing to the commitments stated in the Agreement "in order that the FSLIC will approve the acquisition."  See id. at 1367 (the Dividend Agreement stating Franklin's promise to maintain capital was "in consideration of the FSLIC acting favorably on the Application").

The Court of Federal Claims properly concluded that our decisions in Admiral and Franklin mandate that EPHC assumed the risk of regulatory change and therefore cannot recover for breach of contract based upon the government's enactment of FIRREA.  Hughes II, 71 Fed. Cl. at 321.

II.

Next, we must determine whether Hughes, as an individual, can recover for the government's alleged breach of contract.  This determination rests upon whether or not Hughes was a party to the Dividend Agreement such that the risk-shifting provision prohibits government liability to Hughes for regulatory changes.

The government contends that there was only one overall agreement in this case, including the Dividend Agreement, so that if this court finds Hughes was a party to the agreement, Hughes assumed the risk of regulatory change.  Appellees argue that although Hughes was in privity with respect to the government's promises in separate contractual documents (i.e., the Approval Letter and Forbearance Letter) based on his personal obligations, the Court of Federal Claims properly determined that Hughes was not a party to the Dividend Agreement, and therefore, Hughes can recover for the alleged breach.

The findings made by the Court of Federal Claims on this issue are not entirely clear. In Hughes I, the court found that there was only one contract, stating that "[EPHC]'s application to acquire El Paso Federal, FHLBB's approval letter, the forbearance letter, and the [Dividend Agreement] are part of the contract." 58 Fed. Cl. at 312 (emphasis added). In Hughes II, the court again acknowledged that there was only one overall contract, but then suggested that the Forbearance Letter and the Dividend Agreement should be construed separately, stating "[t]he two documents, while each part of the over-arching contract involved here comprising numerous documents, are separate. Accordingly, one must interpret two separate documents in this contractual melee." 71 Fed. Cl. at 324. The only rationale offered by the Court of Federal Claims as to why the Forbearance Letter and the Dividend Agreement should be separately construed was that "[t]he Forbearance Letter granting the amortization of supervisory goodwill was unqualified." Id. In determining that Hughes was not a party to the Dividend Agreement, the court noted the following facts: "Hughes did not sign the [Dividend Agreement]; the [Dividend Agreement] did not incorporate any of the other contractual documents; the Forbearance Letter is unconditional in its grant of amortization of goodwill forbearance; and the amortization of goodwill forbearance was a condition precedent to the seminal offer here, the [Merger] Agreement." Id. at 321.

We begin our analysis by noting that all of the relevant documents in this case relate to the government-approved merger and conversion of the El Paso thrift. The fact that all of the documents relate to the same transaction, however, is not dispositive because in appropriate circumstances, this court has concluded that various thrift conversion documents constituted separate agreements. Specifically, in Southern

<u>California Federal Savings & Loan Assoc. v. United States</u>, 422 F.3d 1319, 1333 (Fed. Cir. 2005), this court found that although the individual plaintiffs were not party to an Assistance Agreement, they were in contractual privity with the government under a Dividend Agreement. In <u>Southern California</u>, however, the individual documents contained "Entire Agreement clauses" that specifically incorporated certain outside agreements, but did not incorporate the Dividend Agreement into the Assistance Agreement nor vice versa. <u>Id.</u> at 1330. The present case is different than <u>Southern California.</u> This case involves an unassisted transaction, meaning that the government merely approved the acquisition. The relevant contractual documents do not include an Assistance Agreement, whereby the government agrees to additional promises of financial assistance. <u>See</u> <u>Hughes II</u>, 71 Fed. Cl. at 286. In addition, the relevant contractual documents do not contain Entire Agreement Clauses which would indicate separateness of the agreements. Thus, we cannot conclude based on the logic in <u>Southern California</u> that the Forbearance Letter and Dividend Agreement are separate documents such that Hughes could be party to the former but not the latter.

We find the present case analogous to <u>Franklin</u>, where this court determined it need not reach individual shareholder standing because the court concluded that the overall agreement containing the goodwill forbearances also shifted the risk to the private parties. 431 F.3d at 1371. In <u>Franklin</u>, we held that the Approval Letter and Forbearance Letter were not separate contractual documents from the Dividend Agreement, but rather, they constituted "regulatory approvals that could only become enforceable by the mechanism of the Dividend Agreement." <u>Id.</u> at 1365-66. That conclusion is applicable here. In fact, each of the reasons given by the Court of Federal

Claims in <u>Hughes II</u> as to why Hughes should not be bound by the Dividend Agreement was also present in <u>Franklin</u>: (1) the individual plaintiffs were not signatories to the Dividend Agreement, <u>id.</u> at 1365; (2) the Dividend Agreement did not incorporate any of the other related contractual documents, <u>id.</u> at 1366; (3) the Forbearance Letter unconditionally granted a goodwill forbearance for amortization over 25 years, <u>id.</u> at 1363; and the amortization of goodwill forbearance was specifically requested in the application by the private parties, <u>id.</u>   Also like <u>Franklin</u>, the Forbearance Letter in this case was not addressed to the individual shareholder (Hughes), and the Dividend Agreement was signed weeks after execution of the other merger agreements.[2]  <u>Id.</u> at 1363, 1365.

Although there is no evidence here that the parties explicitly discussed execution of the Dividend Agreement during the merger approval negotiations, as was true in <u>Franklin</u>, that does not persuade us that the agreements in this case should be treated separately.  For one, the Approval Letter was conditioned upon compliance with all relevant regulatory provisions.  The relevant regulations at the time required that controlling shareholders enter into a net worth maintenance agreement, such as the Dividend Agreement, personally agreeing to maintain the institution's regulatory capital.  <u>See</u> 12 C.F.R. § 571.6(d)(4)(i) (1988); 49 Fed. Reg. 41,237 (Oct. 22, 1984).  In addition, many of the relevant contractual documents specifically reference one another, further evidencing their interrelatedness.  The Dividend Agreement states that it is in consideration for the government's approval of the merger, as set forth in the Approval

---

[2]     The Dividend Agreement in this case was actually signed on the closing date of the merger and on the same day that Hughes signed the Agreement of Obligation in his individual capacity.  Thus, the timing of the Dividend Agreement further evidences its interrelatedness to the other contractual documents.

Letter. The Approval Letter specifically authorizes the regulators to issue the Forbearance Letter. The Forbearance Letter similarly references that it is in connection with the FHLBB's approval.

For these reasons, we conclude that the series of contractual documents in this case constitute one overall agreement involving the El Paso thrift merger and conversion. If Hughes was a party to that agreement,[3] he too assumed the risk of regulatory change by virtue of the risk-shifting clause in the Dividend Agreement. We therefore reverse the Court of Federal Claims' decision that Hughes could recover from the government for breach of contract.

CONCLUSION

We hold that the Dividend Agreement placed the risk of regulatory change on the private parties, such that they cannot recover for damages resulting from the regulatory capital requirements changed by the government's enactment of FIRREA. Therefore, we need not reach the government's arguments regarding the propriety of the damages awarded to Hughes. The Court of Federal Claims' decision is

AFFIRMED-IN-PART and REVERSED-IN-PART.

COSTS

Each party shall bear its own costs.

---

[3] Because we conclude that the goodwill promises from the government were in the same overall agreement as the risk-shifting provision, we need not reach the issue of whether Hughes had individual standing to sue the government based upon his personal obligations under the agreements. Nor do we consider whether the Agreement of Obligation constituted a separate document from the Dividend Agreement because to the extent that it did, it lacked the goodwill forbearances that gave rise to the present cause of action.